# EXHIBIT A





COPY
SEALED

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

2020 SEP 22 AM 9: 30

CITY CLERK_____

---

COMMODITY FUTURES TRADING
COMMISSION, and

ALABAMA SECURITIES COMMISSION,
STATE OF ALASKA, ARIZONA
CORPORATION COMMISSION,
CALIFORNIA COMMISSIONER OF
BUSINESS OVERSIGHT, COLORADO
SECURITIES COMMISSIONER, STATE
OF DELAWARE, STATE OF FLORIDA,
OFFICE OF THE ATTORNEY GENERAL,
STATE OF FLORIDA, OFFICE OF
FINANCIAL REGULATION, OFFICE OF
THE GEORGIA SECRETARY OF STATE,
STATE OF HAWAII, SECURITIES
ENFORCEMENT BRANCH, IDAHO
DEPARTMENT OF FINANCE, INDIANA
SECURITIES COMMISSIONER, IOWA
INSURANCE COMMISSIONER
DOUGLAS M. OMMEN, OFFICE OF THE
KANSAS SECURITIES COMMISSIONER,
KENTUCKY DEPARTMENT OF
FINANCIAL INSTITUTIONS, MAINE
SECURITIES ADMINISTRATOR, STATE
OF MARYLAND EX REL MARYLAND
SECURITIES COMMISSIONER,
ATTORNEY GENERAL DANA NESSEL
ON BEHALF OF THE PEOPLE OF
MICHIGAN, MISSISSIPPI SECRETARY
OF STATE, NEBRASKA DEPARTMENT
OF BANKING & FINANCE, OFFICE OF
THE NEVADA SECRETARY OF STATE,
NEW MEXICO SECURITIES DIVISION,
THE PEOPLE OF THE STATE OF NEW
YORK BY LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF NEW
YORK, OKLAHOMA DEPARTMENT OF
SECURITIES, SOUTH CAROLINA
ATTORNEY GENERAL, SOUTH
CAROLINA SECRETARY OF STATE,

COMPLAINT FOR INJUNCTIVE RELIEF,
CIVIL MONETARY PENALTIES, AND
OTHER EQUITABLE RELIEF

3-20CV2910-L

Case No.:

Judge:

| | |
|---|---|
| SOUTH DAKOTA DEPARTMENT OF LABOR & REGULATION, DIVISION OF INSURANCE, COMMISSIONER OF THE TENNESSEE DEPARTMENT OF COMMERCE AND INSURANCE, STATE OF TEXAS, WASHINGTON STATE DEPARTMENT OF FINANCIAL INSTITUTIONS, WEST VIRGINIA SECURITIES COMMISSION, AND STATE OF WISCONSIN. | |
| Plaintiffs, | |
| v. | |
| TMTE, INC. a/k/a METALS.COM, CHASE METALS, INC., CHASE METALS, LLC, BARRICK CAPITAL, INC., LUCAS THOMAS ERB a/k/a LUCAS ASHER a/k/a LUKE ASHER, and SIMON BATASHVILI, | |
| Defendants; | |
| and | |
| TOWER EQUITY, LLC, | |
| Relief Defendant. | |

Plaintiffs Commodity Futures Trading Commission ("CFTC" or "Commission"),

Alabama Securities Commission ("State of Alabama"), State of Alaska ("State of Alaska"),

Arizona Corporation Commission ("State of Arizona"), California Commissioner of Business

Oversight ("State of California"), Colorado Securities Commissioner ("State of Colorado"), State

of Delaware ("State of Delaware"), State of Florida, Office of the Attorney General and State of

Florida, Office of Financial Regulation (collectively "State of Florida"), Office of the Georgia

Secretary of State ("State of Georgia"), State of Hawaii, Securities Enforcement Branch (State of

2

Hawaii"), Idaho Department of Finance ("State of Idaho"), Indiana Securities Commissioner

("State of Indiana"), Iowa Insurance Commissioner Douglas M. Ommen ("State of Iowa"),

Office of the Kansas Securities Commissioner ("State of Kansas"), Kentucky Department of

Financial Institutions ("Commonwealth of Kentucky"), Maine Securities Administrator ("State

of Maine"), State of Maryland Ex Rel the Maryland Securities Commissioner ("State of

Maryland"), Attorney General Dana Nessel on Behalf of the People of Michigan ("People of

Michigan"), Mississippi Secretary of State ("State of Mississippi"), Nebraska Department of

Banking & Finance ("State of Nebraska"), Office of the Nevada Secretary of State ("State of

Nevada"), New Mexico Securities Division ("State of New Mexico"), The People of the State of

New York by Letitia James, Attorney General of the State of New York ("State of New York"),

Oklahoma Department of Securities ("State of Oklahoma"), South Carolina Attorney General

and South Carolina Secretary of State ("State of South Carolina") South Dakota Department of

Labor & Regulation, Division of Insurance ("State of South Dakota"), Commissioner of the

Tennessee Department of Commerce and Insurance ("State of Tennessee"), State of Texas

("State of Texas"), Washington State Department of Financial Institutions ("State of

Washington"), West Virginia Securities Commission ("State of West Virginia"), and State of

Wisconsin ("State of Wisconsin") (collectively "the States"), by and through their undersigned

attorneys, hereby allege as follows:

## I.   SUMMARY

1.      From at least September 1, 2017 through the present ("Relevant Period"),

Defendants TMTE, Inc., d/b/a Metals.com, Chase Metals, LLC, Chase Metals, Inc., (collectively

"Metals"), Barrick Capital, Inc. ("Barrick") and their principals, Lucas Asher a/k/a Lucas

Thomas Erb a/k/a Luke Asher ("Asher"), and Simon Batashvili ("Batashvili") (collectively "Defendants") have engaged and continue to engage in a fraudulent scheme to defraud at least 1,600 persons throughout the United States into purchasing gold and silver bullion ("Precious Metals Bullion").

2.      Metals and Barrick are a common enterprise. Batashvili and Asher used both Metals and Barrick to perpetuate the fraudulent scheme.

3.      Defendants targeted a vulnerable population of mostly elderly or retirement-aged persons with little experience in Precious Metals Bullion. By making material misrepresentations and omissions, Defendants deceived investors into purchasing Precious Metals Bullion at prices averaging from 100% to over 300% over the base melt value or spot price of the Precious Metals Bullion ("Prevailing Market Price").

4.      Defendants' scam is particularly egregious because they preyed on persons between 60 and 90 years of age and swindled them out of their retirement funds by charging them fraudulent prices to purchase Precious Metals Bullion.

5.      Defendants deceived at least 1,300 elderly investors into transferring funds from their retirement savings, including funds from liquidating securities, to self-directed individual retirement accounts ("SDIRAs") to purchase Precious Metals Bullion. Defendants deceived elderly investors into investing in Precious Metals Bullion by misrepresenting the operation, risks, and safety of investors' retirement savings. Defendants also fraudulently induced by telephone over 300 elderly and retirement-aged investors to purchase Precious Metals Bullion with cash or credit ("Cash Account").

6.      Defendants directed SDIRA and Cash Account investors to purchase specific

4

Precious Metals Bullion at grossly inflated prices that bore no relationship to the Prevailing

Market Price. Defendants did not disclose the actual value of the Precious Metals Bullion and

instead provided investors with invoices showing exorbitant and unreasonable prices.

      7.      Metals provided investors with customer agreements and failed to disclose that

what it charged investors vastly exceeded what Metals represented to investors. In fact, none of

the actual charges on Metals' fraudulently overpriced Precious Metals Bullion fell within the

substantially lower range of charges represented to investors.

      8.      Defendants falsely represented that Precious Metals Bullion were a safe and

conservative investment and that investors would not lose their funds. Contrary to these

representations, Defendants failed to disclose to SDIRA and Cash Account investors that their

undisclosed, excessive, and unreasonable charges resulted in investors suffering substantial

losses on the purchase of Precious Metals Bullion from Defendants.

      9.      Contrary to Defendants' material misrepresentations and omissions, Defendants

knew or had a reckless disregard for the truth that virtually every one of their SDIRA and Cash

Account investors during the Relevant Period lost the majority of the funds invested in

fraudulently overpriced Precious Metals Bullion.

      10.     Defendants perpetuated their fraudulent scheme by making additional

misrepresentations and omissions to SDIRA and Cash Account investors who purchased

Precious Metals Bullion. Defendants falsely told investors who questioned the grossly inflated

cost of the Precious Metals Bullion after purchase that the Precious Metals Bullion were

exclusive and collectible numismatic or semi-numismatic precious metals that carried a premium

far above the base melt value of the Precious Metals Bullion. These statements were false

because the Precious Metals Bullion were not numismatic or semi-numismatic precious metals. The Precious Metals Bullion were worth significantly less than the value Defendants misrepresented to investors because it carried no additional premium over the Prevailing Market Price.

11.    As a result of their fraudulent scheme, Defendants have solicited and received over $140 million in retirement savings, and over $45 million in Cash Accounts. All of the investors' funds were deposited into bank accounts owned and controlled by the Defendants. Defendants defrauded investors into using over ninety percent of the received funds to purchase fraudulently overpriced Precious Metals Bullion.

12.    During the Relevant Period, Asher and Batashvili committed the acts and/or omissions alleged herein both in their individual capacity, and also within the course and scope of their employment, agency, or office with Metals and Barrick. Metals and Barrick are therefore liable under Section 2(a)(1)(B) of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 2(a)(1)(B) (2018), and CFTC Regulation 1.2, 17 C.F.R. § 1.2 (2019), as principals for Asher's and Batashvili's violations of the CEA, CFTC Regulations, and the laws of the various States as alleged herein.

13.    Accordingly, pursuant to Sections 6c and 6d(1) of the CEA, 7 U.S.C. § 13a-1 (2018) and 7 U.S.C. § 13a-2(1) (2018), the CFTC and States bring this action to enjoin Defendants' unlawful acts and practices, to compel their compliance with the CEA, CFTC Regulations, and State law, and to enjoin them from engaging in any commodity-related activity, as set forth below. In addition, Plaintiffs seek civil monetary penalties for each violation of the CEA, CFTC Regulations, and State law and remedial ancillary relief, including, but not limited

to, trading and registration bans, restitution, disgorgement, rescission, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate. Plaintiffs also request that the Court order Relief Defendant Tower Equity, LLC to disgorge funds that it received from Defendant's illegal activities and in which it has no legitimate interest.

14.     By virtue of this conduct, and as more fully set forth below, Defendants have engaged, are engaging, and/or are about to engage in violations of the anti-fraud provisions of the CEA, Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1) (2018), and CFTC Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2019), and the laws of the States.

15.     Unless restrained and enjoined by the Court, Defendants are likely to continue engaging in the acts and practices alleged in this Complaint or in similar acts and practices, and funds they have obtained fraudulently may be misappropriated or otherwise dissipated.

## II.   JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 (2018) (federal question jurisdiction) and 28 U.S.C. § 1345 (2018) (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress). Section 6c(a) of the CEA, 7 U.S.C. § 13a-1(a) (2018), authorizes the CFTC to seek injunctive and other relief against any person whenever it appears to the CFTC that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the CEA or any rule, regulation, or order thereunder.

17.     Section 6d(1) of the CEA, 7 U.S.C. § 13a-2(1) (2018), authorizes the States to bring a suit in the district courts of the United States to seek injunctive and other relief against any person whenever it appears to the Attorney General and/or Securities Administrator of a

State, or such other official that a State may designate, that the interests of the residents of the State have been, are being, or may be threatened or adversely affected because of violations of the CEA or CFTC Regulations. The acts and omissions in violation of the CEA occurred within each and every one of the States. Investors from each and every one of the States were materially and substantially harmed by Defendants' violations of the CEA.

18.     This Court has supplemental and pendant jurisdiction over the State-law claims of the States pursuant to 28 U.S.C. § 1367(a) (2018).

19.     Defendants engaged in the acts and practices described in this Complaint using instrumentalities of interstate commerce, including but not limited to: the use of interstate wires for transfer of funds, U.S. mail, checks, websites, and other interstate electronic communication devices.

20.     Venue lies properly in this District pursuant to Section 6c(e) of the CEA, 7 U.S.C. § 13a-1(e) (2018), because Defendants transacted business in this District, and certain of the acts and practices in violation of the CEA, the CFTC Regulations, and State laws occurred, are occurring, or are about to occur within this District, among other places. Venue also lies properly in this District pursuant to 17 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in this District.

### III.  PARTIES

21.     Plaintiff Commodity Futures Trading Commission is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the CEA and the CFTC Regulations promulgated thereunder.

22.     Plaintiff States are authorized under Section 6d(1) of the CEA, 7 U.S.C. § 13a-

2(1) (2018), and their respective State laws, to bring this action on behalf of their State and their citizens to enforce the CEA and CFTC Regulations.

23.     Plaintiffs State of Alabama, State of Alaska, State of California, State of Colorado, State of Florida, State of Georgia, Commonwealth of Kentucky, State of Maryland, State of South Carolina, and State of Texas are authorized under their respective State laws, to bring their State law claims on behalf of their State and their citizens to enforce State laws.

24.     Defendant TMTE, Inc., d/b/a Metals.com is a Wyoming corporation with its headquarters at 1712 Pioneer Avenue, Suite 2145, Cheyenne, Wyoming. TMTE, Inc. uses or has used the business names Metals.com, Chase Metals, LLC, and Chase Metals, Inc. TMTE has a place of business at 433 N. Camden Drive, Suite 970, Beverly Hills, California and 8383 Wilshire Blvd Suite 700 Beverly Hills, California. TMTE was originally organized as a Wyoming limited liability corporation on April 30, 2008. It converted to a corporation on March 8, 2017, under the name Chase Metals, Inc.

25.     Defendant Chase Metals, Inc. is a Wyoming corporation now known as TMTE, Inc. Its headquarters are located at 1712 Pioneer Avenue, Suite 2145, Cheyenne, Wyoming, and it has a place of business at 433 N. Camden Drive, Suite 970, Beverly Hills, California and 8383 Wilshire Blvd, Suite 700, Beverly Hills, California.

26.     Defendant Chase Metals, LLC, is a Wyoming limited liability company converted to a Wyoming corporation now known as TMTE, Inc. Its headquarters are located at 1712 Pioneer Avenue, Suite 2145, Cheyenne, Wyoming, and it has a place of business at 433 N. Camden Drive, Suite 970, Beverly Hills, California and 8383 Wilshire Blvd, Suite 700, Beverly Hills, California.

27.     Defendant Barrick Capital, Inc. is a Delaware corporation incorporated on August 20, 2019. It has a place of business at 8383 Wilshire Blvd., Suite 700, Beverly Hills, California. Barrick shares common ownership, operations, employees, office space, and overnight mail account with Metals.

28.     Defendant Simon Batashvili holds himself out as a Founder, Chief Executive Officer, and Principal of Metals. Batashvili is a signatory on Metals' bank accounts, supervises employees, and has authority to hire and fire Metals employees. Batashvili is also a Founder, Owner, Chief Executive Officer, and Principal of Barrick. Batashvili is a signatory on Barrick's bank accounts, supervises employees, and has authority to hire and fire Barrick employees.

29.     Defendant Lucas Asher a/k/a Lucas Thomas Erb a/k/a Luke Asher holds himself out as a Founder, Owner, and Principal of Metals. Asher hires employees and supervises Metals' sales representatives or other agents and their solicitation of current and prospective investors. Asher controls the marketing at Metals, including having a website domain for Metals in his name. Asher holds himself out as a Founder, Owner, and Principal of Barrick. Asher controls the marketing at Barrick, including having a website domain for Barrick. Asher hires employees and supervises Barrick's sales representatives or other agents and their solicitation of current and prospective investors.

30.     Relief Defendant Tower Equity, LLC ("Tower Equity") is a Wyoming limited liability company formed in June 2013. It has a place of business at 8383 Wilshire Blvd., Beverly Hills, CA 90211. Tower Equity received funds from defrauded investors to which it has no legitimate claim or interest.

10

## IV.  GENERAL ALLEGATIONS

### A. Defendants Defrauded Elderly Investors into Establishing SDIRAs to Purchase Precious Metals Bullion

31.     Defendants, directly and by and through their sales representatives or other agents, targeted a vulnerable population of mostly elderly or retirement-aged persons with little experience in Precious Metals Bullion to open SDIRAs to purchase Precious Metals Bullion. Defendants' solicitations targeted politically conservative and Christian investors. Defendants instructed their sales representatives or other agents to concentrate their solicitations on these persons to gain access to their retirement savings.

32.     Defendants, directly and by and through their sales representatives or other agents, instructed their sales representatives or other agents to concentrate their solicitations on elderly or retirement-aged persons to gain access to their retirement savings, including but not limited to, retirement savings held in tax advantaged accounts such as Individual Retirement Accounts; employer sponsored 401(k) and 457(b) plans; Thrift Savings Plans; life insurance; annuities; money market accounts; and other long-term retirement savings vehicles ("Qualified Retirement Savings").

33.     Asher and Batashvili each directed the sales representatives or other agents to employ solicitations designed to instill fear in elderly and retirement aged investors and build trust with investors based on representations of political and religious affinity.

34.     Defendants placed their advertisements on conservative media and websites.

35.     Asher and Batashvili falsely claimed they were friends with a conservative television and radio personality and that the personality recommended buying Precious Metals

11

Bullion, despite receiving a cease and desist demand from this media personality to stop touting this purported affiliation.

36.     Defendants, directly and by and through their sales representatives or other agents, directed investors to open SDIRAs and to transfer funds from their Qualified Retirement Savings to the newly established SDIRAs.

37.     Defendants, directly and by and through their sales representatives or other agents, engaged in the business of advising investors to liquidate preexisting Qualified Retirement Savings, including liquidating securities, and transferring those funds to a SDIRA in order to purchase Precious Metals Bullion.

38.     Defendants, directly and by and through their sales representatives or other agents, solicited investors through telephonic solicitations, social media solicitations, and through their websites, http://www.metals.com and http://barrickcapital.com.

39.     During the Relevant Period, Defendants, directly and by and through their sales representatives or other agents, directed at least 1,300 investors to open SDIRAs. These SDIRAs were mostly opened by persons between the ages of sixty and ninety.

40.     Metals, directly and by and through its sales representatives or other agents, defrauded persons into opening SDIRAs and transferring Qualified Retirement Savings to those accounts by making material misrepresentations and omissions intended to instill fear in the investors including, but not limited to:

> a.  Misrepresenting that the United States government was going to take Qualified Retirement Savings funds in a "Bail-in" to help banks and government programs;
>
> b.  Misrepresenting that IRA custodians are in financial trouble and are likely

to collapse;

    c.  Misrepresenting that it is unclear who actually owns the underlying securities in IRA accounts; and

    d.  Misrepresenting that the government could seize funds held in Qualified Retirement Savings but could not seize Precious Metals Bullion held in SDIRAs.

41.    A large majority of the funds in the SDIRAs were transfers of funds from preexisting Qualified Retirement Savings. During the Relevant Period, Defendants directed investors to use over $140 million from SDIRAs to purchase fraudulently overpriced Precious Metals Bullion.

42.    During the Relevant Period, Defendants instructed investors to send approximately $5 million to Relief Defendant Tower Equity. Between November 2018 and July 2019, Metals sales representatives or other agents directed at least 11 investors to send funds, by check or wire transfer, to the Tower Equity bank account at Bank of America to purchase Precious Metals Bullion from Metals. Tower Equity has no legitimate claim or interest to the funds that it received as a result of the Defendants' fraudulent conduct.

## B.  Metals Defrauded Elderly Investors to Buy Overpriced Polar Bear Bullion That Bore No Relationship to The Prevailing Market Price

43.    Metals, Asher, and Batashvili, directly and by and through their sales representatives or other agents, solicited investors and sold them gold and silver Precious Metals Bullion at fraudulently inflated prices over the Prevailing Market Price.

44.    Silver and gold precious metals are statutorily-defined commodities under Section 1a(9) of the Act, 7 U.S.C. § 1a(9) (2018).

45.    The term "bullion" refers to precious metals in the form of bars, ingots, or coins

in which the value is typically determined by the value of the precious metal content.

46.     Metals, Asher, and Batashvili, directly and by and through their sales representatives or other agents, fraudulently solicited and sold Precious Metals Bullion in the form of the following three gold and silver bullion coins (collectively "Polar Bear Bullion"):

        a.   The 1/2 ounce Silver Royal Canadian Mint Polar Bear Bullion;

        b.   The 1/10 ounce Gold Royal Canadian Mint Polar Bear Bullion; and

        c.   The 1/4 ounce Gold British Standard Bullion.

47.     The actual value of Polar Bear Bullion is the Prevailing Market Price of the gold and silver precious metal contained in the Precious Metals Bullion coins.

48.     Metals, directly and by and through their sales representatives or other agents, failed to disclose the markup charged to customers over the Prevailing Market Price ("Markups").

49.     Metals, directly and by and through their sales representatives or other agents, charged investors undisclosed excessive Markups on Polar Bear Bullion that bore no reasonable relation to the Prevailing Market Price.

50.     Metals, directly and by and through their sales representatives or other agents, failure to disclose unreasonable and excessive Markups on Polar Bear Bullion is a material undisclosed fact which prevented investors from making an informed decision on purchasing Polar Bear Bullion.

51.     Metals, directly and by and through their sales representatives or other agents, failed to disclose to SDIRA and Cash Account investors that the fraudulently over-priced Polar Bear Bullion at the time of purchase averaged:

14

    a. 213% for 1/2 ounce Silver Royal Canadian Mint Polar Bear Bullion over the Prevailing Market Price of silver bullion;

    b. 120% for 1/10 ounce Gold Royal Canadian Mint Polar Bear Bullion over the Prevailing Market Price of gold bullion;

    c. 116% for 1/4 ounce Gold British Standard Bullion over the Prevailing Market Price of gold bullion; and

    d. 21% for all other Precious Metals Bullion over the Prevailing Market Price of the bullion.

52.    During the Relevant Period, Metals fraudulently sold to SDIRA and Cash Account investors:

    a. At least 4.1 million units of 1/2 ounce Silver Royal Canadian Mint Polar Bear Bullion for over $102.4 million;

    b. At least 106,123 units of 1/10 ounce Gold Royal Canadian Mint Polar Bear Bullion for over $31.2 million; and

    c. At least 34,120 units of 1/4 ounce Gold British Standard Bullion for over $24 million.

53.    During the Relevant Period, the percentages of Precious Metals Bullion sold to SDIRA and Cash Account investors by telephone by Metals were approximately:

    a. 58% of sales were 1/2 ounce Silver Royal Canadian Mint Polar Bear Bullion;

    b. 17% of sales were 1/10 Gold Royal Canadian Mint Polar Bear Bullion;

    c. 13% of sales were 1/4 ounce Gold British Standard Bullion; and

    d. 10% of sales were every other type of bullion sold by Metals to investors.

54.    During the Relevant Period, Metals, directly and by and through its sales representatives or other agents, specifically selected and directed elderly and/or retirement-aged SDIRA and Cash Account investors to purchase fraudulently priced Polar Bear Bullion.

55.    As part of the scheme to defraud, Metals, directly and by and through its sales

15

representatives or other agents, directed investors to use Qualified Retirement Savings in their

SDIRAs and funds in their Cash Accounts to purchase fraudulently priced Polar Bear Bullion.

56.     During the Relevant Period, over 90% of the total amount of investors' funds

solicited and received by Metals from investors was used to buy Polar Bear Bullion.

**C. Metals Made Material Misrepresentations and Omissions Resulting in Substantial Investor Losses**

57.     Metals, directly and by and through its sales representatives or other agents, failed

to disclose to SDIRA and Cash Account investors that the undisclosed, excessive, and

unreasonable Markups over the Prevailing Market Price on Polar Bear Bullion resulted in

substantial investor losses.

58.     Metals, directly and by and through its sales representatives or other agents,

misrepresented that Precious Metals Bullion were safe and conservative investments and that

investors would not lose their funds. For example, Metals, directly and by and through its sales

representatives or other agents:

   a.   Misrepresented to Alaska Investor #1, Alabama Investor #1, Alabama
        Investor #2, California Investor #3, California Investor #5, Colorado Investor
        #7, Georgia Investor #1, Maryland Investor #1, South Carolina Investor #1,
        Texas Investor #1, and Texas Investor #4 that Precious Metals Bullion were
        safe and secure investments, and safer than Qualified Retirement Savings.

   b.   Misrepresented to Alaska Investor #1, Alabama Investor #1, California
        Investor #1, Georgia Investor #2, Kentucky Investor #1, Maryland Investor
        #6, South Carolina Investor #2, and Texas Investor #2 that investors would
        not lose their funds invested in Precious Metals Bullion; and

   c.   Misrepresented to Alaska Investor #1, Alabama Investor #1, Alabama
        Investor #2, California Investor #1, Colorado Investor #2, Georgia Investor
        #1, Maryland Investor #3, South Carolina Investor #1, and Texas Investor #4
        that Precious Metals Bullion were a low risk investment.

59.     Contrary to Metals' misrepresentations and omissions, Metals knew or had a

reckless disregard for the truth that virtually all of its SDIRA and Cash Account investors lost the majority of their funds invested in Polar Bear Bullion.

60.     Metals knew or had a reckless disregard for the truth that investors suffered large losses on Polar Bear Bullion. Instead, Metals continued to misrepresent to prospective and current SDIRA and Cash Account investors that Precious Metals Bullion were a safe and conservative investment and that investors would not lose their funds.

61.     Metals failed to disclose to its SDIRA and Cash Account investors that the fraudulently overpriced Polar Bear Bullion materially impacted their ability to profit and the risk of loss.

62.     Metals failed to disclose to its SDIRA and Cash Account investors that an investor's ability to profit and not sustain a loss on the fraudulently overpriced Polar Bear Bullion was dependent on the Prevailing Market Price appreciating significantly above historical all-time high prices and selling their Precious Metals Bullion could incur additional transaction costs.

63.     Metals knew or had a reckless disregard for the truth that because of Metals' undisclosed, fraudulent, and exorbitant Markups on Polar Bear Bullion, most investors lost the majority of their investment funds immediately upon consummating the transaction. It is a material fact to an investor who is making an investment decision that he or she will lose the majority of their funds immediately upon consummating a transaction.

**D. Metals Fraudulently Charged Undisclosed Spreads on Polar Bear Bullion That Vastly Exceeded the Spread Represented in Customer Agreements**

64.     During the relevant period, Metals executed with investors a shipping and

transaction agreement ("Customer Agreement #1") for the purchase of Precious Metals Bullion.

65.     Customer Agreement #1 contains terms and conditions of the sale of Precious

Metals Bullion. Customer Agreement #1 states, in pertinent part, that:

> a.  "Spread on IRA Precious Metals transaction varies between two percent and thirty-three percent (2% to 33%). These numbers, however, are only general ranges and approximations, which are subject to change for a variety of reasons . . ."

> b.  "At the time this Transaction Agreement was transmitted for Customer's signature, (i) metals Spread on bullion (i.e., coins and bars that generally move in tandem with the spot price for the relevant commodity) is generally between one percent and five percent (1 to 5%) ..."

> c.  "Metals is prohibited by law from guaranteeing to repurchase Precious Metals that it sells."

66.     Beginning on or about June 2019 and continuing thereafter, Metals executed with

at least 190 investors a new shipping and transaction agreement ("Customer Agreement #2") for

the purchase of Precious Metals Bullion.

67.     Section 3(a) of both Customer Agreement #1 and Customer Agreement #2 states:

"Within the Precious Metals industry, the difference between [M]etals cost on the day of the

purchase (for the Precious Metals Customer has agreed to buy) and the retail price quoted to

Customer is known as the 'Spread'" (herein: "Spread").

68.     Customer Agreement #2 was substantially similar to Customer Agreement #1,

except that it represented that the Spread Metals charged on IRA Precious Metals Bullion

transactions was significantly smaller. Customer Agreement #2 represented that the Spread on

IRA Precious Metals Bullion transaction only varies between 1% to 19.9%, rather than 2% to

33%. This is a material purported reduction in the Spread.

69.     Though the Spread in Section 3(a) subpart (i) of Customer Agreement #2 remains

18

1% to 5%, Customer Agreement #2 materially changes Section 3(a) subpart (ii) to read: "that [M]etals's Spread on exclusive products from the Government mint is generally between one percent and nineteen point nine percent (1% to 19.9%). Spreads for exclusive gold and silver products and Numismatic coins and bars are often in the range of approximately one percent and nineteen point nine (1% to 19.9%)."

70.     The Spread charged to investors pursuant to Customer Agreement #1 and Customer Agreement #2 represents the difference between what Metals paid for the Precious Metals Bullion and what they charged investors.

71.     As part of the scheme to defraud, the Spreads on Polar Bear Bullion were materially and exorbitantly higher than those represented in Customer Agreement #1 and Customer Agreement #2.

72.     Metals knew or had a reckless disregard for the truth when they represented in Customer Agreement #1 and Customer Agreement #2 that the Spread on IRA Precious Metals Bullion transactions varied between 2% and 33% or 1% and 19.9%. Metals knew or had a reckless disregard for the truth that the Spreads they were charging investors on Polar Bear Bullion vastly exceeded this range.

73.     For Customer Agreement #1, Metals knew or had a reckless disregard for the truth when they represented the Spread on Cash Account transactions was 1% to 5%. Metals knew or had a reckless disregard for the truth that the Spreads that they were charging investors on Polar Bear Bullion vastly exceeded this range.

74.     For Customer Agreement #2, Metals knew or had a reckless disregard for the truth when they represented the Spread on Cash Account transactions varied between 1% and

19

19.9%. Metals knew or had a reckless disregard for the truth that the Spreads that they were charging investors on Polar Bear Bullion vastly exceeded this range.

75.     Metals, directly and by and through its sales representatives or other agents, failed to disclose to their SDIRA and Cash Account investors the true Spread and excessive Markups on Polar Bear Bullion that they were charging them. Instead, Metals instructed its sales representatives and other agents to represent to investors inflated prices for Polar Bear Bullion and provide investors with sales invoices showing exorbitant prices that had no reasonable relation to the Prevailing Market Price.

76.     Metals knew or had a reckless disregard for the truth that the Spread charged by Metals to their elderly or retirement-aged SDIRA and Cash Account investors for the Polar Bear Bullion averaged:

      a.   128% for Silver Royal Canadian Mint Polar Bear Bullion;

      b.   91% for Gold Royal Canadian Mint Polar Bear Bullion; and

      c.   108% for Gold British Standard Bullion.

77.     Metals deceptively failed to disclose to investors the material fact that none of the actual Spreads on Polar Bear Bullion fell within the range of Spreads represented to investors in Customer Agreement #1 and Customer Agreement #2.

**E.  Metals Misrepresented That Polar Bear Bullion Have Numismatic or Semi-
Numismatic Value to Deceive Investors and Conceal Defendants' Fraud**

78.     As part of the scheme to defraud, Metals, directly and by and through their sales

representatives or other agents, fraudulently misrepresented that Polar Bear Bullion were

numismatic or semi-numismatic Precious Metals Bullion.

79.     Numismatic Precious Metals Bullion are rare, of limited availability, and have

significant broad-based market demand and so have a value substantially more than the

Prevailing Market Price of the precious metal contained in the bullion. Semi-numismatic

Precious Metals Bullion refers to bullion that are claimed to exhibit both bullion and numismatic

traits, such that the value is derived from the precious metal content, limited circulation, and

some recognized exclusive or collectible value.

80.     Contrary to Metals' false claims, Polar Bear Bullion have no numismatic or semi-

numismatic value. Polar Bear Bullion are readily available to the public and are not rare. In fact,

there are over 6 million units of Polar Bear Bullion in circulation.

81.     Metals knew or had a reckless disregard for the truth when they falsely

represented to investors that Polar Bear Bullion had numismatic or semi-numismatic value.

82.     Investors received account statements from their SDIRA administrators showing

an account value that was significantly smaller than what Metals misrepresented to investors.

The SDIRA statements showed the accurate value of the Polar Bear Bullion based on the

Prevailing Market Price of the bullion.

83.     Metals, directly and by and through its sales representatives or other agents,

fraudulently represented to investors that Polar Bear Bullion were worth significantly more than

the Prevailing Market Price.

84.     Metals, directly and by and through its sales representatives or other agents,

fraudulently represented to investors that the lower valuation on their SDIRA statements was an

under valuation that did not reflect the resale value of the Polar Bear Bullion ("Post-Purchase

Misrepresentations"). For example, Metals, directly and by and through its sales representatives

or other agents:

      a.   Misrepresented to Alabama Investor #1 and South Carolina Investor #2 that Polar Bear Bullion were exclusive coins and worth more than other Precious Metals Bullion;

      b.   Misrepresented to Alabama Investor #2, Colorado Investor #7, and Colorado Investor #13, that Polar Bear Bullion were the hottest item on the market and investors would make more money on Polar Bear Bullion than on other Precious Metals Bullion;

      c.   Misrepresented to Alabama Investor #1, Alabama Investor #2, Colorado Investor #4, Colorado Investor #9, Kentucky Investor #2, Maryland Investor #6, South Carolina Investor #1, and South Carolina Investor #2 that the actual value of Polar Bear Bullion was higher than what the SDIRA statement showed;

      d.   Misrepresented to Alabama Investor #1, Alabama Investor #2, Colorado Investor #4, Colorado Investor #9, Kentucky Investor #2, Maryland Investor #1, Maryland Investor #4, South Carolina Investor #1, and South Carolina Investor #2 that the SDIRA statements only report the melt value of the Polar Bear Bullion and the melt value does not reflect the fact that Polar Bear Bullion carried a premium above the base melt value of the Precious Metals Bullion contained therein; and

      e.   Misrepresented to Alabama Investor #1, Colorado Investor #2, South Carolina Investor #1, and Maryland Investor #1 that the SDIRA statements displayed the Precious Metals Bullion melt value because it provided a tax break to the investor.

85.     Metals, directly and by and through its sales representatives or other agents,

materially omitted to inform investors that the value of Polar Bear Bullion listed on SIDRA

22

statements was based on the Prevailing Market Price. Metals also materially omitted to disclose to investors that Polar Bear Bullion were worth significantly less than the value Metals misrepresented to investors because they carry no premium over the Prevailing Market Price of Precious Metals Bullion.

86.     Metals, directly and by and through its sales representatives or other agents, referred to the deception or artifice to defraud in the Post-Purchase Misrepresentations as a "Tuck-In." Metals, directly and by and through its sales representatives or other agents, made the Post-Purchase Misrepresentations to placate and calm investors who were upset about the losses shown on their SDIRA statements. In fact, Metals, knowingly or with reckless disregard for the truth, made these misrepresentations and omissions designed to conceal their fraudulent scheme.

**F. Metals Failed to Disclose State Enforcement Actions**

87.     During the Relevant Period, Metals was subject to State enforcement actions, including complaints, emergency actions, disciplinary proceedings, and/or cease and desist orders ("State Orders and Complaints") taken against Metals and various officers, employees, or other agents by State Securities Regulators, including:

  a.  The Emergency Order issued May 1, 2019 and Agreed Order and Undertaking entered July 1, 2019 by the Texas State Securities Board;

  b.  A Consent Cease and Desist Order entered May 16, 2019 by the Minnesota Department of Commerce Commissioner

  c.  A Consent Cease and Desist Order issued July 12, 2019 by the Colorado Securities Commissioner;

  d.  An Emergency Cease and Desist Order issued July 30, 2019 by the Georgia Commissioner of Securities;

  e.  A Cease and Desist Order issued August 8, 2019 by the Alabama Securities Commission;

23

f.   An Emergency Cease and Desist Order entered September 6, 2019 by the Kentucky Department of Financial Institutions;

g.   An Order to Cease and Desist and Order to Show Cause issued November 1, 2019 and Consent Order entered May 26, 2020 by the Missouri Securities Commissioner;

h.   An Administrative Complaint filed December 3, 2019 by the Massachusetts Securities Division of the Office of the Secretary of the Commonwealth;

i.   A Cease and Desist Order entered March 9, 2020 by the Arkansas Securities Commissioner;

j.   A Complaint for Summary Order filed May 26, 2020 and Summary Order to Cease and Desist issued May 26, 2020 by the Nevada Securities Division of the Office of the Secretary of State;

k.   A Notice of Proposed Agency Action filed June 4, 2020 and Temporary Cease and Desist Order entered June 4, 2020 by the Montana State Auditor, Commissioner of Securities and Insurance; and

l.   A Temporary Cease and Desist Order and Notice of Final Order issued July 20, 2020 by the Alaska Director of Commerce, Community, and Economic Development, Division of Banking and Securities.

88.   Metals failed to disclose to investors or prospective investors of the State Orders and Complaints. This was a material fact to investors who were determining or agreed to do business with Metals.

**G. Barrick and Metals are a Common Enterprise**

89.   On August 20, 2019, after States began issuing the State Orders and Complaints in Allegation #87, Batashvili incorporated Barrick and Batashvili and Asher continued to engage in the same fraudulent scheme that they perpetrated at Metals.

90.   Barrick and Metals are a common enterprise with little to no distinction between the ownership and operations of Barrick and Metals. Barrick and Metals have common ownership and control by Asher and Batashvili. Further, many of the sales representatives and

24

other employees and agents of Metals moved to Barrick and have performed the same work for Barrick as they did at Metals. Further, Metals and Barrick operate out of the same office and share the same overnight delivery service account.

91.     As part of this common enterprise, Barrick paid bills and expenses on behalf of Metals, including but not limited to, over $56,000 to pay down Metals' March 2020 corporate credit card bill.

## H. Barrick Made Material Misrepresentations and Omissions Resulting in Substantial Investor Losses on Fraudulently Overpriced Barrick Bullion

92.     As part of the scheme to defraud, Barrick, Asher, and Batashvili, directly and by and through their sales representatives or other agents, directed elderly SDIRA investors to purchase the following Precious Metals Bullion in the form of the following three Precious Metals Bullion coins at fraudulently inflated prices over the Prevailing Market Price ("collectively "Barrick Bullion"):

　　　　　　　a.   1/10 ounce Silver Spade Guinea;

　　　　　　　b.   1/10 ounce Silver Britannia; and

　　　　　　　c.   1/10 ounce Gold Royal Canadian Wildlife Series.

93.     During the Relevant Period, Barrick, directly and by and through their sales representatives or other agents, directed elderly SDIRA investors to purchase Barrick Bullion.

94.     As part of Barrick's scheme to defraud and Barrick's and Metals' common enterprise, Barrick failed to disclose to investors that the 1/10 ounce Gold Royal Canadian Wildlife Series was the same item sold by Metals as the 1/10 ounce Gold Royal Canadian Mint Polar Bear Bullion.

95.     The actual value of Barrick Bullion is the Prevailing Market Price of the Precious

Metals Bullion contained in the bullion coins.

96.     Barrick charged investors undisclosed excessive Markups on Barrick Bullion that bore no reasonable relation to the Prevailing Market Price.

97.     Barrick's failure to disclose unreasonable and excessive Markups on Barrick Bullion is a material undisclosed fact which prevented investors from making an informed decision on purchasing Barrick Bullion.

98.     Barrick, directly and by and through their sales representatives or other agents, failed to disclose to SDIRA investors that the Markup on the fraudulently over-priced Barrick Bullion at the time of purchase averaged:

     a.  312% for 1/10 ounce Silver Spade Guinea over the Prevailing Market Price of silver bullion;

     b.  287% for 1/10 ounce Silver Britannia over the Prevailing Market Price of silver bullion; and

     c.  128% for the 1/10 ounce Gold Royal Canadian Wildlife Series over the Prevailing Market Price of gold bullion.

99.     During the Relevant Period, Barrick fraudulently sold to SDIRA investors:

     a.  At least 567,800 units of the 1/10 ounce Silver Spade Guinea for over $3.8 million;

     b.  At least 93,000 units of the ounce Silver Britannia for over $611,600; and

     c.  At least 17,660 units of the 1/10 ounce Gold Royal Canadian Wildlife Series for over $6.59 million.

100.    During the Relevant Period, the percentages of Precious Metals Bullion sold to SDIRA investors by Barrick were approximately:

     a.  32.5% of sales were Silver Spade Guinea;

     b.  5% of sales were Silver Britannia;

    c.  56% of sales were Gold Royal Canadian Wildlife; and

    d.  6% of sales were every other type of Precious Metals Bullion sold by Barrick to investors.

101.    Barrick knew or had a reckless disregard for the truth that the Spread charged by Barrick to their elderly or retirement-aged SDIRA investors for the Barrick Bullion averaged:

    a.  114.5% for Silver Spade Guinea;

    b.  100% for Silver Britannia; and

    c.  95.7% for Gold Royal Canadian Wildlife.

102.    During the Relevant Period, approximately 89% of the total amount of investors' funds solicited and received by Barrick, directly and by and through its sales representatives or other agents, from investors was used to buy Barrick Bullion.

103.    Contrary to Barrick's misrepresentations and omissions, Barrick knew or had a reckless disregard for the truth that virtually all of its SDIRA investors lost the majority of their funds invested in Barrick Bullion.

104.    Barrick, directly and by and through their sales representatives or other agents, failed to disclose to its SDIRA investors that the fraudulently overpriced Barrick Bullion materially impacted their ability to profit and the risk of loss.

105.    Barrick, directly and by and through its sales representatives or other agents, failed to disclose to its SDIRA investors that an investor's ability to profit and not sustain a loss on the fraudulently overpriced Barrick Bullion was dependent on the Prevailing Market Price appreciating significantly above historical all-time high prices and selling their Precious Metals Bullion could incur additional transaction costs.

106.    Barrick knew or had a reckless disregard for the truth that Barrick's undisclosed,

27

fraudulent, and exorbitant Markups on Barrick Bullion resulted in most investors losing the majority of their investment funds immediately upon consummating the transaction. It is a material fact to an investor who is making an investment decision that he or she will lose the majority of their funds immediately upon consummating a transaction.

## I. Defendants Acted in the States as Unregistered Investment Advisers or Investment Adviser Representatives, Violated Their Fiduciary Duty, and Engaged in Fraud

107.    The Laws of the States govern the registration of Investment Advisers ("IAs") and investment adviser representatives ("IARs") (collectively, "IAs & IARs").

108.    The Laws of the States prohibit (1) fraud in connection with investment advisory services, (2) fraud in connection with the offer, purchase, or sale of securities, (3) fraud in connection with the offer, purchase, or sale of commodities, (4) unfair trade practices, and (5) financial exploitation of the elderly.

### a. Defendants Acted in the States as Unregistered Investment Advisers or Investment Adviser Representatives

109.    Defendants, directly and by and through their sales representatives or other agents, offered and provided investment advice to investors for compensation.

110.    Defendants, by and through their sales representatives or other agents, engaged in the business of providing investment advice to investors in order to earn compensation from the liquidation of investors' Qualified Retirement Savings, some of which held securities.

111.    Metals financially and culturally incentivized its sales representatives or other agents to liquidate investors' Qualified Retirement Savings and transfer as much money as possible to a SDIRA to purchase Precious Metals Bullion.

112.    Defendants, directly and by and through their sales representatives or other

28

agents, offered and provided investment advice to investors to sell securities.

113.    As part of the scheme to defraud, when Defendants, directly and by and through their sales representatives or other agents, recruited a potential investor, Defendants provided investment advice to induce the investors to liquidate their Qualified Retirement Savings, which included securities holdings. Defendants, directly and by and through their sales representatives or other agents, transferred those Qualified Retirement Savings into SDIRAs and assisted the investors in doing so.

114.    Defendants, directly and by and through their sales representatives or other agents, sent investors electronic SDIRA transfer forms that were already filled out and ready for investors to sign. In some cases, Defendants' sales representatives or other agents facilitated phone calls between an investor and the entity holding the investor's Qualified Retirement Savings, which included securities, to arrange the liquidation of investor's Qualified Retirement Savings and the transfer of their Qualified Retirement Savings into a SDIRA.

115.    Defendants, directly and by and through its sales representatives or other agents, provided investment advice and directed investors to purchase Precious Metals Bullion through their SDIRAs. Batashvili selected the types of Precious Metals Bullion, including Polar Bear Bullion, sold to investors and determined when to buy back from investors who sought to liquidate their investments.

116.    Metals and Barrick, directly and by and through their sales representatives or other agents, generally designated themselves as an "interested party" on investors' SDIRA accounts. Defendants, through Barrick's and Metals' designation as an interested party, received unlimited access to investors' SDIRA account information.

29

117. Defendants, directly and by and through their sales representatives or other agents, acted as IAs & IARs, because Defendants, for compensation, engaged in the business of advising another, directly and by or through publications or writings, to wit:

    a. Defendants, directly and by and through their sales representatives or other agents, held themselves out as IAs & IARs to investors;

    b. Defendants, directly and by and through their sales representatives or other agents, solicited investors and provided investment advice to investors with respect to the value of securities or to the advisability of selling securities;

    c. Asher determined what advice and recommendations should be given to investors by instructing Metals' sales representatives or other agents on what to tell investors to induce the investors to liquidate their Qualified Retirement Savings that contained securities;

    d. Defendants, directly and by and through their sales representatives or other agents, touted the advantages of Precious Metals Bullion as an alternative to stocks, bonds, and the Dollar;

    e. Defendants, directly and by and through their sales representatives or other agents, advised about market trends, specifically that the stock market would fail or lose value;

    f. Metals, directly and by and through its sales representatives or other agents, sent victims emails highlighting articles that would induce fear in the investors about their preexisting Qualified Retirement Savings; and

    g. Defendants, directly and by and through their sales representatives or other agents, advised and directed investors to sell securities held in Qualified Retirement Savings and transfer to SDIRAs in order to purchase Precious Metals Bullion, including Polar Bear Bullion and Barrick Bullion, from Defendants;

    h. Defendants, directly and by and through their sales representatives or other agents, provided asset allocation advice, contrary their own websites' recommendations regarding the maximum percentage of Qualified Retirement Savings that should be allocated to Precious Metals Bullion, specifically recommending the full liquidation of Qualified Retirement Savings in order to purchase Precious Metals Bullion with all of the funds transferred; and

    i. Metals, directly and by and through its sales representatives or other agents,

30

advised investors to liquidate specific Qualified Retirement Savings or specific investments that contained securities.

118.   By way of example, Defendants, directly and by and through its sales representatives or other agents, provided investment advice to the following investors:

   a.  Alabama Investor #2 was advised by his sales representative that a stock market crash was probably going to happen, so Alabama Investor #2 should get out of his current investments and get into gold; the risks of investing in Precious Metals Bullion were very low, and that Precious Metals Bullion holds value better than investments in the stock market; Precious Metals Bullion were a safe investment as compared to stocks; people buy Precious Metals Bullion when the stock market goes down because Precious Metals Bullion were safe, and that Alabama Investor #2 should do the same; any money held in an IRA or retirement account was going to be taken or seized by the Government, but an investment in Precious Metals Bullion would not be taken or seized; and that Alabama Investor #2 should place all of his retirement funds in Precious Metals Bullion;

   b.  California Investor #1 was advised by his sales representative that the stock market was due for an imminent, major crash, worse than the 2008 crash, securities invested in the stock market should be sold to purchase Precious Metals Bullion; Metals would pick the best distribution for growth and stability with rock solid value and stability, and investing in Precious Metals Bullion would result in California Investor #1 earning money, not losing it;

   c.  California Investor #6 was advised by her sales representatives that it was important to transfer her money from securities to Precious Metals Bullion and imperative that she learned the truth about why her current account structure in the securities markets was dangerous to her financial future;

   d.  Colorado Investor #4 was advised by their sales representative that Precious Metals Bullion were a good investment considering the economy and that if they stayed in a traditional retirement account they would be at risk of a "buy-in." Colorado Investor #4 was told that a "buy-in" meant the government would nationalize 401(k)'s, if there was another financial crisis, to bail out financial institutions. In addition, the Metals sales representative held himself out as an IAR by calling Colorado Investor #4's custodian and stating to the custodian that Metals and the Custodian had a "mutual client on the line."

   e.  Maryland Investor #4 explained to Metals representatives that he was unsatisfied with his Qualified Retirement Savings, needed a return at or better than the stock market, could not afford to lose money, and needed access to

31

his account if his financial situation worsened. Maryland Investor #4 noted that he was not a businessperson or a stockbroker and would have to depend on Metals as experts to advise. Metals advised Maryland Investor #4:

    i.   Precious Metals Bullion were better than stock, and would get a greater rate;

    ii.   The tax value of Precious Metals Bullion was better than Qualified Retirement Savings, that the face value of the coins was the tax value, and he would get more money when selling;

    iii.   That "[w]e recommend you move your qualified funds in one self-directed IRA trust account that is non-leveraged, has minimal/lower fees, and allows all IRS approved investment options."

f.   Maryland Investor #5 was advised Metals expected a large upswing in the Precious Metals Bullion market, and that something around $300,000 in Precious Metals Bullion could be worth as much as $1.2 million in ten years, but that he could lose everything in the stock market. Metals concluded to Maryland Investor #5 that based on the volatility of the market, the sound investment was Precious Metals Bullion;

g.   Maryland Investor #8 was advised by a Barrick representative who, claiming years of experience in the stock market, represented it would be wise to invest in gold as the stock market continued to fall, gold would climb to $3,000/oz, and there was no risk in converting securities to Precious Metals Bullion;

h.   Maryland Investor #9 was advised by a Metals representative who, claiming to be experienced in the financial industry, represented the Federal Reserve was unstable, that when the Federal Reserve went down, Precious Metals Bullion went up, and thus Precious Metals Bullion were more stable and secure than Qualified Retirement Savings;

i.   South Carolina Investor #1 was advised by a Metals "Senior Portfolio Manager" that she needed to liquidate her investments in the stock market because it was about to collapse because of the chaos in the markets and that gold was a safe investment;

j.   South Carolina Investor #2 was advised that stocks were not safe and that he needed to buy precious metals right away;

k.   Texas Investor #2 was advised Polar Bear Bullion were safer than keeping his Qualified Retirement Savings in securities. He was told his investment would double in 4 years if he instead invested in Polar Bear Bullion. Metals' sales

representative persuaded Texas Investor #2 to invest approximately $289,000 instead of the approximately $50,000 he originally intended to invest in Precious Metals Bullion

l.  Texas Investor #3 was advised to transfer her Qualified Retirement Savings to a SDIRA to invest in Polar Bear Bullion. She had no knowledge of Precious Metals Bullion but trusted Metals' sales representative because he built a rapport with her by discussing the market for Precious Metals Bullion, the outlook for her Qualified Retirement Savings, and built up his expertise and their relationship over approximately a year and a half

m.  Texas Investor #4 was advised he should protect his savings by liquidating his Qualified Retirement Savings, rolling the funds into a SDIRA, and purchasing Polar Bear Bullion. He was told Precious Metals Bullion were more stable and secure and a better investment than the stocks in this Qualified Retirement Savings. Texas Investor #4 was persuaded to liquidate his entire Qualified Retirement Savings account to buy Precious Metals Bullion instead of the approximately $50,000 he initially intended to invest in Precious Metals Bullion. After he purchased Polar Bear Bullion, Metals' sales representative advised against selling some of the Precious Metals Bullion to buy a particular stock.

119.    Metals and Barrick have never been registered as IAs, nor have their agents or Asher or Batashvili been registered as IARs required under state and/or federal law. Defendants or their agents never submitted a notice filing with the appropriate State regulator as an IA or IAR, nor are they exempt from State registration as an IA or IAR.

**b.  As Investment Advisers or Investment Adviser Representatives, Defendants Violated Their Fiduciary Duty to Investors and Engaged in Fraud**

120.    Defendants acted as IAs & IARs. IAs & IARs have a fiduciary duty to their clients. By acting as IAs & IARs, Defendants have a duty to their clients beyond the general prohibition on fraud arising from the CEA.

121.    The fiduciary duty requires IAs & IARs to act primarily for the benefit of their clients. At a minimum, to avoid violating their fiduciary duty, IAs & IARs:

a.  Must avoid conflicts of interest with investors;

33

b.  Must have reasonable grounds that their recommendations to investors are suitable based on a reasonable inquiry concerning the investor's investment objectives, financial situation and needs, and any other information known or acquired by the investment adviser after reasonable examination of the investor's finances;

c.  May not charge unreasonable fees;

d.  Must disclose material facts to the investors, including conflicts of interest; and

e.  May not make material misrepresentations or omissions to investors;

122.  Defendants violated their fiduciary duty to investors by making recommendations where they have a conflict of interest with their clients, making unsuitable recommendations, charging unreasonable fees, failing to disclose conflicts of interest, including those related to how Defendants and their sales representatives or other agents were paid, and making material misrepresentations or omissions to investors.

123.  Regarding suitability, Defendants engaged in fraud and violated their fiduciary duty through conduct including, but not limited to, the following:

a.  Defendants targeted primarily senior and retirement-age investors with scare tactics to instill the fear that investors' Qualified Retirement Savings, including securities, were imperiled by government action or market forces;

b.  Defendants failed to make reasonable inquiry into, or take consideration of, investors' investment objectives, financial situation and needs, or station in life when advising investors to liquidate their Qualified Retirement Savings;

c.  Defendants used information gathered about investors' circumstances to encourage investment in Precious Metals Bullion instead of using the information to determine the suitability of the recommendations for the investors;

d.  Defendants advised investors to transfer their entire Qualified Retirement Savings to Precious Metals Bullion—a single alternative asset class; and

e.  Defendants failed to advise investors of the recommendation in Metals'

34

Customer Agreements that no investor should invest more than 20 percent of the available investment funds in Precious Metals Bullion, and instead advised Defendants to transfer as much funds as they could, up to their entire Qualified Retirement Savings.

124.    Defendants further violated their fiduciary duty to investors by charging Spreads that constitute an unreasonable fee. The Spreads disclosed in the Customer Agreements lack definiteness and are unreasonable at the upper end of the range. Most egregiously, and fraudulently, the Spreads actually charged investors were far greater than the range represented in the Customer Agreements. In particular:

a.    The Spread indicated by Metals' Customer Agreements for IRA transactions ranged from 2-33% in Customer Agreement #1 and from 1-19.9% in Customer Agreement #2. The Customer Agreement describes Precious Metals Bullion products with a Spread of 1-5% and actual purchases of other Precious Metals Bullion had a Spread of 9%;

b.    The Spread actually charged to investors for Polar Bear Bullion had no rational relationship to the Spread or fee Metals' otherwise represented or charged for other Precious Metals Bullion;

c.    The range of the Spread indicated by Metals' Customer Agreements for IRA transactions lacked definiteness and disclosed an unreasonable range, leaving the true cost to prospective investors uncertain;

d.    Most of the range of the Spread indicated by Metals' Customer Agreements for IRA transactions provided a fee far in excess of IAs & IARs' industry standards; and

e.    Defendants knew that due to the size of the Spread actually charged investors, in addition to the upper ranges of the Spread represented in the Customer Agreements for IRA transactions, investors' ability to profit and not sustain a loss on the overpriced Precious Metals Bullion were dependent on the Prevailing Market Price appreciating significantly above historical all-time high prices and selling their Precious Metals Bullion could incur additional transaction costs.

125.    Defendants, directly and by and through their sales representatives or other agents, engaged in fraud and violated their fiduciary duty by making material misrepresentations

35

and material omissions in providing investment advice to investors to transfer their Qualified

Retirement Savings, including divesting themselves of securities, and purchase Precious Metals

Bullion from Metals.

126.   Defendants, directly and by and through their sales representatives or other

agents, made material misrepresentations and material omissions regarding Qualified Retirement

Savings, including securities, as compared to Precious Metals Bullion which included, but were

not limited to, the following:

- a.   Made misleading statements to instill fear in elderly and retirement-aged investors about their Qualified Retirement Savings in order to justify the advice to liquidate and transfer these funds to Defendants for purchase of Precious Metals Bullion;

- b.   Misrepresented that the government was going to take their retirement funds from Qualified Retirement Savings in a "Bail-in" to help banks and government programs;

- c.   Misrepresented that IRA custodians are in bad shape, custodians are likely to fall apart, and that it is unclear who actually owns the underlying securities held in Qualified Retirement Savings accounts;

- d.   Misrepresented that the government could seize funds held in Qualified Retirement Savings, but not Precious Metals Bullion accounts;

- e.   Misrepresented that Precious Metals Bullion investments could not lose value;

- f.   Misrepresented that investors would profit from Precious Metals Bullion;

- g.   Misrepresented that Precious Metals Bullion would provide a greater rate of return that securities;

- h.   Misrepresented that the tax benefits of Precious Metals Bullion were better than securities;

- i.   Misrepresented that Precious Metals Bullion were definitively a safer, more conservative, or less volatile investment than securities; and

- j.   Omitted that precious metals involve considerable risk and are at times

36

volatile investments that are affected by economic conditions, political events, and speculative activities.

127.    Defendants, by and through their sales representatives or other agents, made material misrepresentations and material omissions regarding their connections to and relationships with conservative media personalities which included, but were not limited to, the following:

    a.  Misrepresented that Asher and Batashvili are friends with a conservative television and radio personality and that this conservative personality recommended buying Precious Metals Bullion, despite receiving a cease and desist demand from this media personality to stop touting this purported affiliation; and

    b.  Misrepresented that this conservative television and radio personality was affiliated with, backed, or endorsed Metals despite receiving a cease and desist demand from this media personality to stop touting this purported affiliation.

128.    Defendants, directly and by and through their sales representatives or other agents, made material misrepresentations and material omissions regarding the experience and expertise of their sales representatives or other agents which included, but were not limited to, the following:

    a.  Misrepresented and/or omitted their lack of experience in determining whether securities and other investments constitute suitable investments for the investor;

    b.  Misrepresented or omitted their lack of experience in valuing securities and calculating market volatility;

    c.  Misrepresented or omitted their lack of experience in forecasting economic conditions, such as the likelihood of recession and the possibility of inflation, as well as predicting the exchange rate of the Dollar; and

    d.  Misrepresented or omitted their experience in determining whether securities and other investments constitute appropriate products for these elderly investors.

129.    Defendants, directly and by and through their sales representatives or other agents, made material omissions by failing to disclose information about complaints, including complaints relating to fraudulent, deceptive, and illegal practices, sent, submitted, or otherwise levied by prior investors.

130.    Defendants, directly and by and through their sales representatives or other agents, made material omissions by failing to disclose the identities of Defendants' sales representatives or other agents during interactions with investors by using false names and not disclosing the true identity of Defendants' sales representatives or other agents.

131.    Defendants, directly and by and through their sales representatives or other agents, made material misrepresentations and material omissions regarding their compensation structure which included, but were not limited to, the following:

    a.    Misrepresented how the Defendants' sales representatives or other agents were compensated; and

    b.    Failed to reveal conflicts of interest arising from Defendants' sales representative compensation being tied to the amount of funds from investors' Qualified Retirement Savings invested in Precious Metals Bullion.

132.    Defendants, directly and by and through their sales representatives or other agents, made material misrepresentations regarding their Spread and fees, which included, but were not limited to, the following:

    a.    Misrepresented to investors that Metals would pay any fees, such as storage fees, associated with their Precious Metals Bullion for the first 2-5 years, depending on the investor; and

    b.    Misrepresented to investors that the funds transferred from Qualified Retirement Savings and Cash Accounts were used to purchase Precious Metals Bullion, when in fact Metals and Barrick charged large percentages in excess of the Prevailing Market Price.

38

133.     Defendants, directly and by and through their sales representatives or other agents, made material omissions regarding Defendants' Spread on Precious Metals Bullion, which included, but were not limited to, the following:

a.   Failed to disclose the actual Spread charged to investors;

b.   Failed to disclose the method of calculating compensation and amount of compensation actually paid to sales representatives or other agents who sold Precious Metals Bullion to investors;

c.   Failed to disclose that the Spreads actually charged and that the Spreads represented in Customer Agreement #1 and Customer Agreement #2 materially impacted investors' ability to profit and the risk of loss;

d.   Failed to disclose that an investor's ability to profit and not sustain a loss on the Precious Metals Bullion investment was dependent on the Prevailing Market Price appreciating significantly above historical all-time high prices and selling their Precious Metals Bullion could incur additional transaction costs;

e.   Failed to disclose the losses that investors would incur upon transferring their Qualified Retirement Savings to a SDIRA and purchasing Precious Metals Bullion based on the Spread actually charged by Metals or the Spread represented in Customer Agreement #1 and Customer Agreement #2; and

f.   Failed to disclose that Precious Metals Bullion might not appreciate enough to cover storage and SDIRA fees associated with Precious Metals Bullion investments.

### c.   The Fraud Defendants Engaged in Violates Additional States' Laws

134.     The foregoing conduct also violates state laws prohibiting: (1) any person from making material misrepresentations or omissions in connection with the offer, purchase, or sale of securities, (2) material misrepresentations or omissions in connection with the offer, purchase, or sale of commodities, (3) unfair or deceptive trade practices, and (4) financial exploitation of the elderly.

135.     Defendants, directly and by and through their sales representatives or other

39

agents, used material misrepresentations and omissions as set forth in paragraphs 124 through 131 and elsewhere in this complaint in connection with investors' sale of securities held in Qualified Retirement Savings.

136.     Through these material misrepresentations and omissions, Defendants solicited investors to sell securities in order to ultimately gain access to those funds through the sale of overpriced Precious Metals Bullion. The profits obtained by the Defendants and compensation paid to their sales representatives or other agents were related to the amount of Qualified Retirement Savings, including securities, that Defendants convinced investors to liquidate.

137.     The conduct described in paragraphs, 55 through 75, 124 through 131, and elsewhere in this complaint also violates state law governing commodities fraud, unfair or deceptive trade practices, and financial exploitation of the elderly.

## V.   VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND CFTC REGULATIONS

### COUNT I

### Fraud

**Violations of Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1) (2018), and CFTC Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2019)**

*(Brought by all Plaintiffs)*

138.     The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

139.     During the Relevant Period, Defendants, individually and also operating as a common enterprise, and acting through various officers, employees or agents, intentionally or recklessly, in connection with contracts of sale of commodities in interstate commerce,

   a. Used or employed, or attempted to use or employ, a scheme or artifice to defraud;

   b. Made, or attempted to make untrue or misleading statements of material fact, or omitted to state material facts necessary to make the statements made not untrue or misleading; and/or

   c. Engaged in, or attempted to engage in, acts, practices, or a course of business that operated or would operate as a fraud or deceit on Metals' and Barrick's customers.

140.    As a result of the foregoing conduct, Defendants' fraudulent conduct violated 7 U.S.C. § 9(1) (2018) and 17 C.F.R. § 180.1(a)(1)-(3) (2019).

141.    The acts, omissions, and failures of Asher and Batashvili and other officials, agents, or persons acting for Metals and Barrick described in this Complaint, including sales representatives or other agents, have occurred within the scope of their employment, agency, or office with Metals and Barrick are deemed to be the acts, omissions, and failures of Metals and Barrick by operation of Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B) (2018), and CFTC Regulation 1.2, 17 C.F.R. § 1.2 (2019).

142.    Asher and Batashvili controlled Metals and Barrick and have not acted in good faith or have knowingly induced, directly or indirectly, the acts constituting Metals' and Barrick's violations alleged in this count. As a result, pursuant to Section 13(b) of the CEA, 7 U.S.C. § 13c(b) (2018), Asher and Batashvili are liable for Metals' and Barrick's violations of 7 U.S.C. § 9(1) (2018), and 17 C.F.R. § 180.1(a)(1)-(3) (2019), as controlling persons.

143.    At all times relevant to this Complaint, Asher and Batashvili acted within the course and scope of their employment, agency, or office with Metals and Barrick. Pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2018), and CFTC Regulation 1.2, 17 C.F.R. § 1.2 (2019), Metals and Barrick are liable as principals for Asher's, Batashvili's, and their other

41

agents' acts and omissions in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

144.    Each use or employment or attempted use or employment of any manipulative device, scheme, or artifice to defraud; untrue or misleading statement of fact, omission of material fact necessary to make statements not untrue or misleading; or act of engaging, or attempting to engage, in acts, practices or courses of business that operated or would have operated as a fraud or deceit on Metals' and Barrick's investors is alleged as a separate and distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

## VI.    VIOLATIONS OF THE CODE OF ALABAMA

*(Brought by Plaintiff State of Alabama)*

### Securities Fraud
### Definitions

145.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

146.    Section 8-6-2(7), Code of Alabama (1975), defines the term "person" to include a natural person; a corporation created under the laws of this or any other state, country, sovereignty, or political subdivision thereof; a partnership; an association; a joint-stock company; a trust, excluding testamentary trusts, trusts for the benefit of the creator or another, court-created trusts, or public charitable trusts; and any unincorporated organization.

147.    Section 8-6-2(10), Code of Alabama (1975) defines the term "security" broadly to include, but not limit to, any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment

contract, as well as any instrument of any kind commonly known as a security.

148.    Section 8-6-2(18), Code of Alabama (1975), defines an investment adviser as any person, who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities.

149.    Section 8-6-2(19), Code of Alabama (1975), defines an investment adviser representative as any partner, officer, director of (or a person occupying a similar status or performing similar functions) or other individual employed by or associated with an investment adviser, except clerical or ministerial personnel, who makes any recommendation or otherwise renders advice regarding securities; manages accounts or portfolios of clients; determines which recommendation or advice regarding securities should be given; and/or supervises employees who perform any of the foregoing.

## COUNT II

### Unregistered Investment Adviser and Investment Adviser Representatives
### Violations of § 8-6-3(b) and (c), Code of Alabama (1975)

150.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

151.    Section 8-6-3(b) Code of Alabama (1975) makes it unlawful for any person to transact business in the State of Alabama as an investment adviser or as an investment adviser representative unless:

    (1) He or she is so registered under Article 6 of the Alabama Code (1975);

    (2) His or her only clients in this state are investment companies as defined in the Investment Company Act of 1940, other investment advisers, broker-dealers,

43

banks, trust companies, savings and loan associations, insurance companies, employee benefit plans with assets of not less than $1,000,000, and governmental agencies or instrumentalities, whether acting for themselves or as trustees with investment control, or other institutional investors as are designated by rule or order of the commission; or

(3) He or she has no place of business in the state and during any period of 12 consecutive months does not direct business communications in this state in any manner to more than five clients, other than those specified in the previous subdivision, whether or not he, she, or any of the persons to whom the communications are directed is then present in the state.

152.     Section 8-6-3(c) Code of Alabama (1975) makes it unlawful for any investment adviser required to be registered to employ an investment adviser representative unless the investment adviser representative is registered under Article 6 of the Code of Alabama (1975).

153.     Metals and Barrick unlawfully acted as investment advisers by, for compensation, engaging in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of selling securities.

154.     Asher and Batashvili unlawfully acted as investment adviser representatives by being a partner, officer, director of (or a person occupying a similar status or performing similar functions) or other individual employed by or associated with Metals and Barrick, who made recommendations or otherwise rendered advice regarding securities; determined which recommendation or advice regarding securities should be given; and supervised employees, to include sales representatives or other agents, who performed these functions.

155.     During the relevant period, the Defendants were at no time registered as Investment Advisers or Investment Adviser Representatives in the State of Alabama and had not perfected an exemption.

156.     As a result of their conduct, the Defendants violated Sections 8-6-3(b) and (c),

Code of Alabama (1975).

## COUNT III

**Investment Advice Fraud**
**Violations of § 8-6-17(b)(2), Code of Alabama (1975)**

157.     The allegations in the preceding paragraphs are re-alleged and incorporated herein

by reference.

158.     Section 8-6-17(b)(2), Code of Alabama (1975), makes it unlawful for any person

who receives, directly or indirectly, any consideration from another person for advising the other

person as to the value of securities or their purchase or sale, whether through the issuance of

analyses or reports or otherwise, to engage in any act, practice, or course of business which

operates or would operate as a fraud or deceit upon the other person.

159.     During the relevant period, the Defendants, willfully and unlawfully, directly or

indirectly, by and through others, including their sales representatives or other agents, received

compensation from Alabama investors by fraudulently and deceitfully advising Alabama

investors to sell their securities held in Qualified Retirement Savings, and then use those funds to

purchase Precious Metals Bullion. The fraudulent and deceitful advice resulted in the Defendants

converting the majority of the investment funds to their own benefit without the knowledge of

the Alabama Investors.

160.     As a result of their conduct, the Defendants violated Section 8-6-17(b)(2), Code

of Alabama (1975).

## COUNT IV

**Material Misrepresentations & Omissions in Connection with the Sale of a Security**
**Violations of § 8-6-17(a)(2), *Code of Alabama* (1975)**

45

161.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

162.    Section 8-6-17(a)(2) makes it unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly, to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading.

163.    During the relevant period, Defendants, willfully and unlawfully, in connection with the sale of any security, directly or indirectly, by and through others, including their sales representatives or other agents, made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, as contained in the complaint. As a result of the material misrepresentations and omissions by the Defendants, Alabama investors sold their securities held in Qualified Retirement Savings, and then used those funds to purchase Precious Metals Bullion. The material misrepresentations and omissions resulted in the Defendants converting the majority of the investment funds to their own benefit without the knowledge of the Alabama Investors.

164.    As a result of their conduct, the Defendants violated Section 8-6-17(a)(2), *Code of Alabama* (1975).

## COUNT V

**Financial Exploitation of the Elderly
Definitions**

165.    Section 13A-6-191(3), Code of Alabama (1975), defines an elderly person as a person 60 years of age or older.

166.    Section 13A-6-191(2), Code of Alabama (1975), defines deception as occurring when a person knowingly:

     a.  Creates or confirms another's impression which is false and which the defendant does not believe to be true;

     b.  Fails to correct a false impression which the defendant previously has created or confirmed;

     c.  Fails to correct a false impression when the defendant is under a duty to do so;

     d.  Prevents another from acquiring information pertinent to the disposition of the property involved;

     e.  Sells or otherwise transfers or encumbers property, failing to disclose a lien, adverse claim, or other legal impediment to the enjoyment of the property, whether that impediment is or is not valid, or is not a matter of official record;

     f.  Promises performance which the defendant does not intend to perform or knows will not be performed.

167.    Section 13A-6-191(5), Code of Alabama (1975), defines financial exploitation as the use of deception, intimidation, undue influence, force, or threat of force to obtain or exert unauthorized control over an elderly person's property with the intent to deprive the elderly person of his or her property or the breach of a fiduciary duty to an elderly person by the person's guardian, conservator, or agent under a power of attorney which results in an unauthorized appropriation, sale, or transfer of the elderly person's property.

47

**Financial Exploitation of the Elderly**
**Violations of § 13A-6-195, *Code of Alabama* (1975)**

168.     The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

169.     Section 13A-6-195 Code of Alabama (1975) makes it unlawful for any person to financially exploit an elderly person in which the value of the property taken exceeds two thousand five hundred dollars ($2,500).

170.     During the relevant period, the Defendants, by and through others, including their sales representatives or other agents, intentionally and knowingly used deception to obtain or exert unauthorized control over the retirement funds of Alabama Investors with the intent to deprive the Alabama Investors of a majority of their retirement funds. Each Alabama Investor was 60 years of age or older and lost more than $2,500.00 dollars.

171.     Due to the deceptive conduct and statements made by the Defendants, by and through others, including their sales representatives or other agents, Alabama investors liquidated Qualified Retirement Savings and purchased Precious Metals Bullion. The deception resulted in the Defendants converting the majority of the investment funds to their own benefit without the knowledge of the Alabama Investors.

172.     As a result of their conduct, the Defendants violated Section 13A-6-195, *Code of Alabama* (1975).

## VII.  VIOLATIONS OF THE ALASKA STATUTES

*(Brought by Plaintiff State of Alaska)*

### COUNT VI

**Unfair Trade Practices
Violations of Alaska Stat. § 45.50.471**

173.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

174.    Alaska Stat. § 45.50.471(a) provides that "Unfair or deceptive acts or practices in the conduct of trade or commerce are declared to be unlawful."

175.    Alaska Stat. § 45.50.471(b) provides that "[t]he terms 'unfair methods of competition' and 'unfair or deceptive acts or practices' include the following acts: . . .

> (11) engaging in any other conduct creating a likelihood of confusion or of misunderstanding and that misleads, deceives, or damages a buyer or a competitor in connection with the sale or advertisement of goods or services;
> (12) using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived, or damaged;
> . . .
> (35) violating Alaska Stat. § 45.63 (solicitations by telephonic means) …

176.    Metals, Barrick, Batashvili, and Asher, and their agents or employees, engaged in conduct creating a likelihood of confusion or misunderstanding that mislead, deceived, or damaged buyers in connection with the sale or advertisement of goods.

177.    Metals, Barrick, Batashvili, and Asher, and their agents or employees, used or employed deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealed, suppressed, or omitted material facts with the intent that others rely upon the

49

concealment, suppression, or omission in connection with the sale or advertisement of goods.

178.    Alaska Stat. § 45.63.010(a) provides that:

A person may not sell or attempt to sell property or services by telephonic means if the person makes substantially the same offer on substantially the same terms to two or more persons, unless the telephone seller is registered with the Department of Law at least 30 days before the solicitation campaign.

179.    Alaska Stat. § 45.63.100(a)(4) and (5) provide that:

(4) "solicitation campaign" means a sale or attempt to sell property or services by telephonic means by making substantially the same offer on substantially the same terms to two or more persons.
(5) "telephone seller" means a person required to be registered under Alaska Stat. § 45.63.010.

180.    Through telephonic means, Metals, Barrick, Batashvili, and Asher, and their employees or agents, offered to sell or sold substantially similar property or services on substantially similar terms to two or more persons, but did not register with the Department of Law. Specifically, Metals, Barrick, Batashvili, and Asher, directly and by and through their agents or employees, sold Precious Metals Bullion to at least eight Alaska investors at a Spread so high it consumed more than half of the amount initially invested and used similar standard form agreements for each transaction.

181.    As described herein, Metals, Barrick, Batashvili, and Asher engaged in unfair and deceptive acts or practices in violation of Alaska Stat. § 45.50.471 related to the sale of Precious Metals Bullion and related financial services.

182.    Batashvili and Asher had actual knowledge, were recklessly indifferent, or knew that it was highly probable that Metals and Barrick or the agents and employees of Metals and Barrick were engaging in unfair or deceptive acts or practices. Batashvili and Asher had the

50

authority to control the unfair or deceptive acts or practices that Metals, Barrick, and their

employees or agents engaged in. Batashvili and Asher are thus liable for any such violations of

Alaska Stat. § 45.50.471 committed by Metals or Barrick, regardless of whether Batashvili and

Asher personally committed the violations.

183.    Because Metals and Barrick are a common enterprise, Metals and Barrick are

both liable for any violations of Alaska Stat. § 45.50.471.

184.    Batashvili and Asher used Metals and Barrick to perpetuate the fraudulent

scheme. Batashvili and Asher are thus liable for any violations of Alaska Stat. § 45.50.471,

regardless of whether Batashvili and Asher personally committed the violations.

### VIII.  VIOLATIONS OF THE CALIFORNIA STATUTES

*(Brought by Plaintiff State of California)*

### COUNT VII

### Unlicensed Investment Advice
### (Cal. Corp. Code, § 25230)

185.    The allegations in the preceding paragraphs are re-alleged and incorporated herein

by reference.

186.    An "investment adviser" is defined under the Corporate Securities Law of 1968

(CSL) (Corp. Code, § 25000 et seq.) section 25009 in relevant part as "any person who, for

compensation, engages in the business of advising others . . . as to the value of securities or as to

the advisability of . . . selling securities . . . "

187.    California Corporations Code section 25230 provides, in relevant part:

(a) It is unlawful for any investment adviser to conduct business as an
investment adviser in this state unless the investment adviser has first

51

applied for and secured from the commissioner a certificate, then in effect, authorizing the investment adviser to do so or unless the investment adviser is exempted by the provisions of Chapter 1 (commencing with Section 25200) of this part or unless the investment adviser is subject to Section 25230.1.

188.   California Corporations Code section 25403 provides:

(a) Every person who with knowledge directly or indirectly controls and induces any person to violate any provision of this division or any rule or order thereunder shall be deemed to be in violation of that provision, rule, or order to the same extent as the controlled and induced person.

(b) Any person that knowingly provides substantial assistance to another person in violation of any provision of this division or any rule or order thereunder shall be deemed to be in violation of that provision, rule, or order to the same extent as the person to whom the assistance was provided.

(c) It shall be unlawful for any person directly or indirectly to do any act or thing which would be unlawful for that person to do under any provision of this division or any rule or order thereunder through or by any other person.

(d) Nothing in this section shall be construed to limit the power of the state to punish any person for any conduct which constitutes a crime under any other statute.

189.   At all relevant times, Defendants working from their Beverly Hills, California offices conducted business as investment advisers without a certificate from the Commissioner, or a valid exemption, in violation of CSL section 25230 by the conduct described in this complaint including warning senior citizens that the stock market was due for an imminent, major crash, worse than 2008, and advising investors to sell securities to purchase Precious Metals Bullion to save and protect their investment because the government could seize retirement savings and bank accounts, but not Precious Metals Bullion holdings. Defendants further warned investors that leaving investments in the securities markets was dangerous to

52

investors' financial future. Defendants gained, and investors lost, when investors sold securities and purchased overpriced Precious Metals Bullion.

190.   Alternatively, Metals and Barrick violated CSL section 25230 and Batashvili and Asher, as Metals and Barrick's founders and owners, knowingly controlled and induced, or knowingly substantially assisted, Metals and Barrick's violations of CSL section 25230, by the conduct described in this complaint including: (1) hiring, training, and supervising sales representatives or other agents, (2) training sales representatives or other agents to provide investors with securities market and Precious Metals Bullion advice, and (3) training sales representatives or other agents to advise investors to sell their Qualified Retirement Savings to purchase Precious Metals Bullion.

## COUNT VIII

### Investment Adviser Fraud
### (Cal. Corp. Code § 25235)

191.   The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

192.   California Corporations Code section 25235 provides, in relevant part:

> It is unlawful for any investment adviser, directly or indirectly, in this state:
> (a) To employ any device, scheme, or artifice to defraud any client or prospective client.
> (b) To engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon any client or prospective client.

193.   At all relevant times, Defendants violated CSL section 25235 by the conduct described in this complaint including operating a scheme to defraud investors out of their

53

retirement savings by misrepresenting to elderly and retirement aged investors that the securities

markets would imminently crash, worse than the 2008 crash, and that the government could seize

funds held in retirement accounts but not Precious Metals Bullion accounts, which were safer

and less volatile than securities accounts and could not lose value. Inexperienced, trusting, senior

citizens allowed Defendants to choose the Precious Metals Bullion they purchased. Defendants

deceptively placed approximately 90% of all investors' investments in overpriced Polar Bear

Bullion and Barrick Bullion. Defendants failed to disclose: (1) the risks associated with investing

in Precious Metals Bullion, (2) conflicts of interest arising from Defendants' compensation being

tied to the amount of funds invested, and (3) the Markup on the overpriced Precious Metals

Bullion.

194.    Alternatively, Metals and Barrick violated CSL section 25235 and Batashvili and

Asher as Metals' and Barrick's founders and owners, knowingly controlled and induced, or

knowingly substantially assisted, Metals and Barrick's violations of CSL section 25235, by: (1)

hiring, training, and supervising sales representatives or other agents, (2) training sales

representatives or other agents to provide investors with securities market and Precious Metals

Bullion advice; (3) training sales representatives or other agents to direct investors to sell their

Qualified Retirement Savings to purchase Precious Metals Bullion, (4) choosing the Precious

Metals Bullion that trusting, inexperienced, senior citizens purchased, and placing approximately

90% of all investors' investments in the overpriced Polar Bear Bullion and Barrick Bullion ; and

(5) failing to disclose Defendants' Markup, leading to investors' immediate loss, when investors

purchased the overpriced Precious Metals Bullion.

54

## COUNT IX

### Commodities Fraud
### (Cal. Corp. Code, § 29536)

195.     The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

196.     California Corporations Code section 29536 provides:

It is unlawful for any person, directly or indirectly, in connection with the purchase or sale of, the offer to sell, the offer to purchase, the offer to enter into, or the entry into, a commodity, commodity contract, or commodity option to do any of the following:

(a) To willfully employ any device, scheme, or artifice to defraud.

(b) To willfully make any false report, enter any false record, make any untrue statement of a material fact, or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

(c) To willfully engage in any transaction, act, practice, or course of business which operates or would operate as a fraud or deceit upon any persons.

(d) To willfully misappropriate or convert the funds, security, or property of any other person

197.     California Corporations Code section 29552 provides:

Any person who materially assists in any violation of this law, or any rule or order of the commissioner under this law, is jointly and severally liable with any other person liable under this law for the violation.

198.     Under California Commodity Law of 1990 (CCL) (Corp. Code, § 29500 et seq.) sections 29504 and 29515, precious metals including gold and silver coins and bullion are "commodities."

199.     Under CCL section 29505, a "commodity contract" means "any account,

55

agreement, or contract for the purchase or sale, primarily for speculation or investment purposes and not for consumption by the offeree or purchaser . . .."

200.    At all relevant times, Defendants offered to sell and sold, and offered to purchase and purchased, commodities and entered into commodity contracts from its principal place of business in Beverly Hills, California.

201.    CCL section 29536 applies to the transactions, agreements, or contracts offered by Defendants.

202.    At all relevant times Defendants violated CCL section 29536 by the conduct described in this complaint including employing a scheme to defraud investors out of their retirement savings by misrepresenting to elderly and retired aged investors that the securities markets would imminently crash, worse than the 2008 crash, and that the government could seize funds held in retirement accounts but not Precious Metals Bullion accounts, which were safer and less volatile than securities accounts and could not lose value. Inexperienced, trusting, senior citizens allowed Defendants to choose the Precious Metals Bullion they purchased. Defendants deceptively placed approximately 90% of all investors' investments in overpriced Polar Bear Bullion and Barrick Bullion. Defendants failed to disclose: (1) the risks associated with investing in Precious Metals Bullion, (2) conflicts of interest arising from Defendants' compensation being tied to the amount of funds invested, and (3) the Markup on the overpriced Precious Metals Bullion.

203.    Alternatively, Metals and Barrick violated CCL section 29536 and Batashvili and Asher as Metals and Barrick's founders and owners knowingly controlled and induced, or knowingly substantially assisted, Metals and Barrick's violations of CCL section 29536, by the

conduct described in this complaint including: (1) hiring, training, and supervising sales representatives or other agents, (2) training sales representatives or other agents to provide investors with securities market and Precious Metals Bullion advice, (3) training sales representatives or other agents to direct investors to sell their Qualified Retirement Savings to purchase Precious Metals Bullion, (4) choosing the Precious Metals Bullion that trusting, inexperienced, senior citizens purchased, and placing approximately 90% of all investors' investments in the overpriced Polar Bear Bullion and Barrick Bullion ; and (5) failing to disclose Defendants' Markup, leading to investors' immediate loss, when investors purchased the overpriced Precious Metals Bullion.

## IX.  VIOLATIONS OF THE COLORADO STATUTES

*(Brought by Plaintiff State of Colorado)*

### COUNT X

**Commodities Fraud**
**§§ 11-53-107(1)(a)-(c), C.R.S.**

204.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

205.    In connection with the purchase or sale of a commodity contract or option, the offer to sell or offer to purchase a commodity contract or option, the offer to enter into a commodity contract or option, or the entry into a commodity contract or option, Defendants, directly or indirectly, in violation of § 11-53-107(1)(a)–(c), C.R.S., did:

    a.    Cheat or defraud, attempt to cheat or defraud, or employ a device, scheme, or artifice to defraud;

    b.    Make a false report, enter a false record, make an untrue statement of material fact or omit to state a material fact necessary to make the statements made, in

57

light of the circumstances under which they were made, not misleading; or

    c.   Engage in a transaction, act, practice, or course of business, including without limitation any form of advertising or solicitations, which operates or would operate as a fraud or deceit on Metals customers or potential customers.

206.    At all times relevant to this Complaint, Batashvili and Asher acted within the scope of their employment or office with Metals and Barrick. Pursuant to § 11-53-109(1), C.R.S., Metals and Barrick are liable as principals for Batashvili's and Asher's violations of § 11-53-107, C.R.S.

207.    At all times relevant to this Complaint, Defendants Batashvili and Asher controlled Metals and Barrick and have not acted in good faith or have knowingly induced, directly or indirectly, the acts constituting Metals' and Barrick's violations alleged in this Count. As a result, pursuant to § 11-53-109(2), C.R.S., Defendants Asher and Batashvili are liable for Metals' and Barrick's violations of § 11-53-107, C.R.S.

## COUNT XI

### Securities Fraud
### Violations of §§ 11-51-501(1)(a), (b) and (c), C.R.S.

208.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

209.    In connection with the sale of securities in Colorado, the Defendants, directly or indirectly:

    a.   employed a device, scheme or artifice to defraud;

    b.   made written and oral untrue statements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; or

    c.   engaged in acts, practices or courses of business which operated and would

operate as a fraud and deceit on investors;

all in violation of § 11-51-501(1), C.R.S.

## X.   VIOLATIONS OF FLORIDA STATUTES

*(Brought by Plaintiff State of Florida)*

### COUNT XII

**Deceptive and Unfair Trade Practices
Violations of Fla. Stat. 501.204**

210.    The allegations in the preceding paragraphs are re-alleged and incorporated herein

by reference.

211.    At least 60 or more Florida consumers, including consumers aged 60 or older,

relied on the Defendants' misrepresentations, false statements, and omissions of material fact,

which were made through phone, email, and written communications, in deciding to purchase

Precious Metals Bullion or other bullion from the Defendants.

212.    At least 60 or more Florida consumers opened SDIRAs at the recommendation of

the Defendants or their sales agents to facilitate the transactions.

213.    Certain of these Florida consumers purchased more than one form of Polar Bear

Bullion at the recommendation of the Defendant or their sales agents.

214.    At least 60 or more Florida consumers have suffered harm, and certain Florida

consumers continue to suffer harm, associated with the Defendants' deceptive and unfair trade

practices.

215.    Section 501.204(1), Florida Statutes, the Florida Deceptive and Unfair Trade

Practices Act ("FDUTPA"), provides that unfair methods of competition, unconscionable acts or

practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are

unlawful. Misrepresentations, false statements or omissions of material fact constitute deceptive acts or practices prohibited by FDUTPA.

216.    Section 501.203(7), Florida Statutes, defines "consumer" as "an individual; child, by and through its parent or legal guardian; business; firm; association; joint venture; partnership; estate; trust; business trust; syndicate; fiduciary; corporation; any commercial entity, however denominated; or any other group or combination."

217.    Section 501.203(8), Florida Statutes, defines "trade or commerce" as "the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated."

218.    During the Relevant Period, Defendants and their agents or employees, individually or as a common enterprise, violated Section 501.204(1), Florida Statutes, in each of 60 or more transactions with Florida consumers, because they made representations or omissions of material fact in trade or commerce to Florida consumers which were likely to mislead a consumer acting reasonably in the circumstances to the consumer's detriment.

## COUNT XIII

### Commodities Prohibited Practices - Fraud
### Violations of Fla. Stat. 517.275

219.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

220.    Section 517.275, Florida Statutes, provides "[i]t is unlawful and a violation of this chapter for any person to engage in any act or practice in or from this state, which act or practice

constitutes a violation of any provision of the Commodity Exchange Act, 7 U.S.C. ss. 1 *et seq*.,

as amended, or the rules and regulations of the Commodity Futures Trading Commission

adopted under that act as amended."

221.    During the Relevant Period, Defendants and their agents or employees,

individually or as a common enterprise, violated the Commodity Exchange Act as set forth in

Count I of this Complaint, in each of 60 or more transactions with Florida investors, and thereby

violated Section 517.275, Florida Statutes, on 60 or more occasions.

## XI.   VIOLATIONS OF THE GEORGIA CODE

*(Brought by Plaintiff State of Georgia)*

### COUNT XIV

**Unregistered Investment Adviser**
**Violations of Ga. Code Ann. § 10-5-32**

222.    The allegations in the preceding paragraphs are re-alleged and incorporated herein

by reference.

223.    Ga. Code Ann. § 10-5-2 provides in relevant part:

> A.    "Investment adviser" means a person that, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or the advisability of investing in, purchasing, or selling securities or that, for compensation and as a part of a regular business, issues or promulgates analysis or reports concerning securities. The term includes a financial planner or other person that, as an integral component of other financially related services, provides investment advice to others for compensation as part of a business or that holds itself out as providing investment advice to others for compensation

> B.    "Investment adviser representative" means an individual employed by or associated with an investment adviser

61

or federal covered investment adviser who makes any recommendations or otherwise gives investment advice regarding securities, manages accounts or portfolios of clients, determines which recommendation or advice regarding securities should be given, provides investment advice or holds herself or himself out as providing investment advice, receives compensation to solicit, offer, or negotiate for the sale of or for selling investment advice, or supervises employees who perform any of the foregoing.

224.    Ga. Code Ann. § 10-5-32 provides in relevant part:

        A.    It is unlawful for a person to transact business in this state as an investment adviser unless the person is registered under this chapter as an investment adviser or is exempt from registration as an investment adviser.

        B.    It is unlawful for an individual to transact business in this state as an investment adviser representative unless the individual is registered under this chapter as an investment adviser representative or is exempt from registration as an investment adviser.

225.    Ga. Code Ann. § 10-5-33 provides in relevant part:

It is unlawful for an individual to transact business in this state as an investment adviser representative unless the individual is registered under this chapter as an investment adviser representative or is exempt from registration as an investment adviser

226.    Metals unlawfully acted as an investment adviser because Metals, for compensation, engaged in the business of advising another, directly and/or through publications or writings, with respect to the sale of securities or to the advisability of investing in, purchasing, or selling securities.

227.    Metals has not been registered with the Commissioner, nor has Metals submitted a notice filing with the Commissioner at any time.

228.    Barrick unlawfully acted as an investment adviser because Barrick, for

compensation, engaged in the business of advising another, directly and/or through publications or writings, with respect to the sale of securities or to the advisability of investing in, purchasing, or selling securities.

229.    Barrick has not been registered with the Commissioner, nor has Barrick submitted a notice filing with the Commissioner at any time.

230.    Batashvili and Asher unlawfully acted as investment adviser representatives, because Batashvili and Asher, for compensation, are employed, appointed, and/or authorized by Metals, an investment adviser, to solicit clients for Metals and they are providing investment advice to Metals' clients on behalf of Metals.

231.    As a result of the foregoing unlawful conduct, Metals, Barrick, Batashvili, and Asher violated Ga. Code Ann. § 10-5-32 and Ga. Code Ann § 10-5-33.

## COUNT XV

### Securities Fraud
### Violations of Ga. Code Ann. § 10-5-51

232.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

233.    Ga. Code Ann. § 10-5-51 provides, in relevant part, that it is unlawful for a person that advises others for compensation, either directly or indirectly, or through publications or writings, as to the value of securities or the advisability of investing in, purchasing, or selling securities or that, for compensation and as part of a regular business, issues or promulgates analyses or reports relating to securities: (1) [t]o employ a device, scheme, or artifice to defraud another person; or (2) [t]o engage in an act, practice, or course of business that operates or would

operate as a fraud or deceit upon another person.

234.     Metals and Barrick, acting through various officers, employees, or agents, and

Batashvili and Asher in connection with the rendering of investment advice, (1) employed a

device, scheme, or artifice to defraud another person; or (2) engaged in an act, practice, or course

of business that operates or would operate as a fraud or deceit upon another person.

235.     As a result of the foregoing unlawful conduct, Metals, Barrick, Batashvili, and

Asher violated S Ga. Code Ann. § 10-5-51.

### COUNT XVI

**Unlawful Solicitation and Sale of Commodities**
**Violations of Ga. Code Ann. § 10-5A-2**

236.     The allegations in the preceding paragraphs are re-alleged and incorporated herein

by reference.

237.     Ga. Code Ann. § 10-5A-1 provides in relevant part:

> A.     "Commodity" means, except as otherwise specified by the
> Commissioner by rule, regulation, or order . . . any metal or
> mineral
> B.     "Precious metal" means the following in either coin,
> bullion, or other form:
> **(A)** Silver;
> **(B)** Gold;
> **(C)** Platinum;
> **(D)** Palladium;
> **(E)** Copper; and
> **(F)** Such other items as the Commissioner may specify by rule,
> regulation, or order.

238.     Ga. Code Ann. § 10-5A-2 provides in relevant part:

> Except as otherwise provided in Code Section 10-5A-3 or 10-5A-
> 4, no person shall solicit the purchase or sale of or offer to sell or
> purchase any commodity under any commodity contract or under

any commodity option or offer to enter into as seller or purchaser any commodity contract or commodity option.

239.    Ga. Code Ann. § 10-5A-7 provides in relevant part:

A.    The act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person.

B.    Every person who directly or indirectly controls another person liable under any provision of this chapter . . . is also liable jointly and severally with and to the same extent as such other person.

240.    Metals unlawfully solicited the sale of precious metals and sold precious metals to Georgia investors.

241.    Metals has never been registered with the Commissioner, nor has Metals submitted a notice filing with the Commissioner at any time.

242.    Barrick unlawfully solicited the sale of precious metals and sold precious metals to Georgia investors.

243.    Barrick has never been registered with the Commissioner, nor has Barrick submitted a notice filing with the Commissioner at any time.

244.    Batashvili and Asher unlawfully solicited the sale of precious metals and sold precious metals to Georgia investors, because Batashvili and Asher are employed, appointed, and/or authorized by Metals to solicit the sale of precious metals and sell precious metals on behalf of Metals.

245.    As a result of the foregoing conduct, Metals, Barrick, Batashvili, and Asher

violated Ga. Code Ann. § 10-5A-2.

## COUNT XVII

**Commodities Fraud**
**Violations of Ga. Code Ann. § 10-5A-6**

246. The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

247. Ga. Code Ann. § 10-5A-6 provides in relevant part, that in connection with the solicitation of a purchase or sale of, the offer to sell, the offer to purchase, the offer to enter into, or the entry into of any commodity contract or commodity option:

> No person shall directly or indirectly in connection with the solicitation of a purchase or sale of, the offer to sell, the offer to purchase, the offer to enter into, or the entry into of any commodity contract or commodity option. :
>
> > **(1)** Cheat or defraud, or attempt to cheat or defraud, any other person or employ any device, scheme, or artifice to defraud any other person;
> >
> > **(2)** Willfully make any false report, enter any false record, or make any untrue statement of a material fact or fail to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading;
> >
> > **(3)** Engage in any transaction, act, practice, or course of business, including, without limitation, any form of advertising or solicitation, which operates or would operate as a fraud or deceit upon any person; or
> >
> > **(4)** Willfully misappropriate or convert the funds, security, or property of any other person in connection with the solicitation of a purchase or sale of, the offer to sell, the offer to purchase, the offer to enter into, or the entry into of any commodity contract or commodity option subject to the provisions of Code Section 10-5A-2, Code Section 10-5A-

66

3, or paragraph (2) or (4) of subsection (a) of Code Section 10-5A-4.

248.     Metals and Barrick, acting through various officers, employees, or agents, and Batashvili and Asher, in connection with the solicitation to sell and the sale of precious metals: **(1)** Cheated or defrauded, or attempted to cheat or defraud, another person or employed a device, scheme, or artifice to defraud another person; **(2)** willfully made a false report, entered a false record, or made an untrue statement of a material fact or failed to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; **(3)** engaged in a transaction, act, practice, or course of business, including, without limitation, any form of advertising or solicitation, which operated or would operate as a fraud or deceit upon another person; or **(4)** willfully misappropriated or converted the funds, security, or property of another person in connection with the solicitation of a purchase or sale of, the offer to sell, the offer to purchase, the offer to enter into, or the entry into of any commodity contract or commodity option.

249.     As a result of the foregoing unlawful conduct, Metals, Barrick, Batashvili, and Asher violated Ga. Code Ann. § 10-5A-6.

## XII. VIOLATIONS OF KENTUCKY STATUTES

*(Brought by Plaintiff State of Kentucky)*

### COUNT XVIII

**Unregistered Investment Adviser
Violations of KRS 292.330(8)**

250.     The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

251.    KRS 292.310(11) defines "Investment adviser" as "any person who, for compensation, directly or indirectly, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as a part of a regular business, issues or promulgates analyses or reports concerning securities."

252.    KRS 292.310(19) defines "Security", in relevant part, as,

> "[A]ny note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, life settlement investment, voting-trust certificate, certificate of deposit for a security; fractional undivided interest in oil, gas, or other mineral rights; or, in general, any interest or instrument commonly known as a "security.""

253.    KRS 292.330(8) makes it "unlawful for any person to transact business in this state as an investment adviser unless the person is registered under this chapter as an investment adviser or is exempt from registration under subsection (9) of this section."

254.    Based on the facts set forth above, Defendants, directly and by and through their agents or representatives, in direct contravention of KRS 292.330(8), transacted business as an investment adviser by advising clients to roll their stock-funded IRAs, a security, into self-directed IRAs invested in Precious Metals Bullion, despite failing to be registered as an investment adviser under KRS Chapter 292 and accordingly violated KRS 292.330(8).

## COUNT XVIX

### Securities Fraud
### Violations of KRS 292.320(1)

255.    The allegations in the preceding paragraphs are re-alleged and incorporated herein

by reference.

256.    Pursuant to KRS 292.320(1), "[i]t is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly:

(a) To employ any device, scheme, or artifice to defraud;

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

257.    Defendants, directly and by and through their agents or representatives, employed a device, scheme, or artifice to defraud, made an untrue statement of a material fact or to omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit upon any person." Defendants therefore violated KRS 292.320(1).

## XIII.  VIOLATIONS OF THE MARYLAND CODE

*(Brought by Plaintiff State of Maryland)*

### COUNT XX

**Unregistered Investment Adviser and Investment Adviser Representative
Violations of Md. Code, Corps. & Assn's § 11-401(b)(1)**

258.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

69

259.    The Maryland Securities Act, Md. Code, Corps. & Assn's § 11-101(i)(1) provides

in relevant part:

260.        Investment adviser" means a person who, for compensation:

(i) Engages in the business of advising others, either directly or
through publications or writings, as to the value of securities or as
to the advisability of investing in, purchasing, or selling securities,
or who, for compensation and as a part of a regular business, issues
or promulgates analyses or reports concerning securities; or
(ii) Provides or offers to provide, directly or indirectly, financial
and investment counseling or advice, on a group or individual
basis; or
(iii) Holds out as an investment adviser in any way, including
indicating by advertisement, card, or letterhead, or un any other
manner indicates that the person is, a financial or investment
"planner", "counselor," "consultant," or any other similar type of
adviser or consultant.

261.    The Maryland Securities Act, Md. Code, Corps. & Assn's § 11-101(j) provides in

relevant part:

"Investment adviser representative" or "representative" means any
partner, officer, director of (or a person occupying a similar status
or performing similar functions) or other individual who is
employed by or associated with an investment adviser, or who has
a place of business located in this State and is employed by or
associated with a federal covered adviser . . and who:

(i) Makes any recommendations or otherwise renders investment
advice to clients;
(ii) Represents an investment adviser in rendering [investment
adviser services];
(iii) Manages accounts or portfolios of clients;
(iv) Determines which recommendation or investment advice
should be given with respect to a particular client account;
(v) Solicits, offers, or negotiates for the sale of or sells investment
advisory services;
(vi) Directly supervises employees who perform any of the
foregoing; or
(vii) Holds out as an investment adviser.

262.     The Maryland Securities Act, Md. Code, Corps. & Assn's § 11-401(b)(1),

provides in relevant part that a person may not transact business in this State as an investment

adviser or as an investment adviser representative unless the person is registered as an

investment adviser or an investment adviser representative under this subtitle.

263.     Metals and Barrick have never been registered in Maryland as an investment

adviser nor is Metals exempt from registration.

264.     Metals and Barrick unlawfully acted as investment advisers by: (1) for

compensation advising investors regarding the value of securities or as to the advisability of

investing in, purchasing, or selling securities, (2) by providing, directly or indirectly, financial

and investment counseling to investors, and (3) by holding itself out as an investment adviser.

265.     Batashvili and Asher have never been registered in Maryland as investment

adviser representatives nor are they exempt from registration.

266.     Batashvili and Asher, as partners, officers, or directors of Metals and Barrick,

unlawfully acted as investment adviser representatives by: (1) making any recommendations or

otherwise rendering investment advice to clients, (2) representing Metals and Barrick in

rendering investment adviser services, (3) determining which recommendation or investment

advice should be given with respect to a particular client account, (4) soliciting, offering, or

negotiating for the sale of or sells investment advisory services, (5) directly supervising

employees who perform any investment adviser representative services, and (6) holding out as an

investment adviser.

267.     As a result of the foregoing unlawful conduct, Metals, Barrick, Batashvili, and

71

Asher violated the Maryland Securities Act, Md. Code, Corps. & Assn's § 11-401(b)(1).

## COUNT XXI

### Employment of Unregistered Investment Adviser Representative
### Violations of Md. Corps. & Assn's § 11-402(b)(1)

268.   The allegations in the preceding paragraphs are re-alleged and incorporated herein

by reference.

269.   Md. Code, Corps. & Assn's § 11-402(b)(1) provides in relevant part:

An investment adviser required to be registered may not employ or associate with
an investment adviser representative unless the representative is registered under
this subtitle.

270.   Metals and Barrick, acting as an investment adviser required to be registered,

employed and associated with Batashvili, Asher, and numerous other individuals as investment

adviser representatives.

271.   As a result of the foregoing unlawful conduct, Metals and Barrick violated Md.

Code, Corps. & Assn's § 11-402(b)(1).

## COUNT XXII

### Securities Fraud
### Violations of Md. Code, Corps. & Assn's § 11-301

272.   The allegations in the preceding paragraphs are re-alleged and incorporated herein

by reference.

273.   Md. Code, Corps. & Assn's § 11-302(1) provides in relevant part:

It is unlawful for any person, in connection with the offer, sale, or
purchase of any security, directly or indirectly to:

(1) Employ any device, scheme, or artifice to defraud;
(2) Make any untrue statement of a material fact or omit to state a

material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading; or
(3) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit on any person.

274. In connection with the sale of securities held by Marylanders primarily for retirement purposes, Metals and Barrick, acting through various officers, employees, or agents, and Batashvili and Asher, employed a device, scheme, or artifice to defraud, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or engaged in acts, practices, and courses of business which operates or would operate as a fraud or deceit on any person.

275. Based on the foregoing conduct, Metals, Barrick, Batashvili, and Asher violated Md. Code, Corps. & Assn's § 11-302(1).

## COUNT XXIII

### Fraud and Unethical Business Practices in Investment Advisory Activities
### Violations of Md. Code, Corps. & Assn's § 11-302 and COMAR 02.02.05.03

276. The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

277. Md. Code, Corps. & Assn's § 11-302 provides in relevant part:

(a) It is unlawful for any person who receives, directly or indirectly, any consideration from another person for advising the other person as to the value of securities or their purchase or sale, or for acting as an investment adviser or representative under § 11-101(i) and (j) of this title, whether through the issuance of analyses, reports, or otherwise to:

(1) Employ any device, scheme, or artifice to defraud the other

73

person;

(2) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit on the other person; [or]

(3) Engage in dishonest or unethical practices.

(c) In the solicitation of or dealings with advisory clients, it is unlawful for any person willfully to make any untrue statement of a material fact, or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading.

278.  COMAR 02.02.05.03 provides in relevant part:

(B) An investment adviser is a fiduciary and has a duty to act primarily for the benefit of its clients. While the extent and nature of this duty varies according to the nature of the relationship between an investment adviser and its clients and the circumstances of each case, and investment adviser may not engage in unethical business practices, including the following:

(1) Recommending to a client to whom investment supervisory, management, or consulting services are provided the purchase, sale, or exchange of a security without reasonable grounds to believe that the recommendation is suitable for the client on the basis of information furnished by the client after reasonable inquiry concerning the client's investment objectives, financial situation and needs, and any other information known or acquired by the investment adviser after reasonable examination of the client's financial records.

(8) Misrepresenting to an advisory client or prospective advisory client the qualifications of the investment adviser, or an investment adviser representative employed by or associated with the investment adviser or an employee of the investment adviser, or misrepresenting the nature of the advisory services being offered or fees to be charged for that service, or omitting to state a material fact necessary to make the statements made regarding qualifications, services, or fees, in light of the circumstances under which they are made, not misleading.

(10) Charging a client an unreasonable advisory fee in light of the fees charged by other investment advisers providing essentially the

same services.

(12) Guaranteeing a client that a certain or specific result will be achieved, for example, gain or no loss, as a result of the advice that will be rendered.

279.     Metals and Barrick, acting through various officers, employees, or agents, and Batashvili and Asher, while advising Marylanders as to the value of securities for their purchase or sale, or while acting as investment advisers or representatives employed a device, scheme, or artifice to defraud, in violation of Md. Code, Corps. & Assn's § 11-302.

280.     Metals and Barrick, acting through various officers, employees, or agents, and Batashvili and Asher, while advising Marylanders as to the value of securities for their purchase or sale, or while acting as investment advisers or representatives engaged in acts, practices, and courses of business which operate or would operate as a fraud or deceit on any person in violation of Md. Code, Corps. & Assn's § 11-302.

281.     Metals and Barrick, acting through various officers, employees, or agents, and Batashvili and Asher, while advising Marylanders as to the value of securities for their purchase or sale, or while acting as an investment adviser or representative, willfully to made untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading in violation of Md. Code, Corps. & Assn's § 11-302.

282.     Metals and Barrick, acting through various officers, employees, or agents, and Batashvili and Asher, while advising Marylanders as to the value of securities for their purchase or sale, or while acting as an investment adviser or representative, engaged in unethical or dishonest business practices in violation of Md. Code, Corps. & Assn's § 11-302 and COMAR

75

02.02.05.03.

## XIV.  VIOLATIONS OF THE SOUTH CAROLINA CODE

*(Brought by Plaintiff State of South Carolina)*

### <u>COUNT XXIV</u>

**Unregistered Investment Adviser and Investment Adviser Representative
Violations of S.C. Code Ann. § 35-1-403 to 35-1-404**

283.    The allegations in the preceding paragraphs are re-alleged and incorporated herein

by reference.

284.    South Carolina Code Ann. § 35-1-102(15), provides in relevant part:

> "Investment adviser" means a person that, for compensation, engages in the
> business of advising others, either directly or through publications or
> writings, as to the value of securities or the advisability of investing in,
> purchasing, or selling securities or that, for compensation and as a part of a
> regular business, issues or promulgates analyses or reports concerning
> securities. The term includes a financial planner or other person that, as an
> integral component of other financially related services, provides
> investment advice regarding securities to others for compensation as part of
> a business or that holds itself out as providing investment advice regarding
> securities to others for compensation.

285.    South Carolina Code Ann. § 35-1-102(16), provides in relevant part:

> "Investment adviser representative" means an individual employed by or
> associated with an investment adviser or federal covered investment adviser
> and who makes any recommendations or otherwise gives investment advice
> regarding securities, manages securities accounts or portfolios of clients,
> determines which recommendation or advice regarding securities should be
> given, provides investment advice regarding securities or holds herself or
> himself out as providing investment advice regarding securities, receives
> compensation to solicit, offer, or negotiate for the sale of or for selling
> investment advice regarding securities, or supervises employees who
> perform any of the foregoing.

286.    It is unlawful for a person to transact business in South Carolina as an investment

adviser unless the person is registered under this chapter as an investment adviser or is exempt from registration as an investment adviser. S. C. Code Ann. § 35-1-403(a).

287.    It is unlawful for an individual to transact business in this State as an investment adviser representative unless the individual is registered under this chapter as an investment adviser representative or is exempt from registration as an investment adviser representative. S. C. Code Ann. § 35-1-404(a).

288.    Metals unlawfully acted as an investment adviser because Metals, for compensation, engaged in the business of advising another, directly and/or through publications or writings, with respect to the value of securities or to the advisability of investing in, purchasing, or selling securities, despite not being registered as an investment adviser under the Act, in violation of S.C. Code Ann. § 35-1-403(a).

289.    Batashvili and Asher, as partners, officers, or directors of Metals, unlawfully acted as investment adviser representatives because they, directly and through their sales representatives or other agents, made recommendations or otherwise gave investment advice regarding securities, managed securities accounts or portfolios of clients, determined which recommendation or advice regarding securities should be given, provided investment advice regarding securities or held herself or himself out as providing investment advice regarding securities, received compensation to solicit, offer, or negotiate for the sale of or for selling investment advice regarding securities, or supervised employees who perform any of the foregoing, despite not being registered as an investment adviser representative under the Act, in violation of S.C. Code Ann. § 35-1-404(a).

290.    Therefore, Defendants violated the South Carolina Uniform Securities Act of

2005.

## COUNT XXV

### Securities Fraud
### Violations of S.C. Code Ann. § 35-1-501(1)-(3) and § 35-1-502(a)

291.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

292.    South Carolina Code Ann. § 35-1-501(1)-(3), provides in relevant part:

It is unlawful for a person, in connection with the offer, sale, or purchase of a security, directly or indirectly:
a.   employed a device, scheme or artifice to defraud;
b.   made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
c.   engaged in acts, practices, or courses of business that operated or would operate as a fraud or deceit upon another person.

293.    The Defendants participated in the offer or sale of securities by means of a scheme to defraud, with untrue statements of material fact or omissions to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading (the buyers not knowing of the untruths or omissions), or engaged in acts, practices, or courses of business that operated as a fraud on the investors. Therefore, Defendants violated S.C. Code Ann. § 35-1-501(1)-(3).

294.    South Carolina Code Ann. § 35-1-502(a), provides in relevant part:

It is unlawful for a person that advises others for compensation, either directly or indirectly or through publications or writings, as to the value of securities or the advisability of investing in, purchasing, or selling securities or that, for compensation and as part of a regular business, issues or promulgates analyses or reports relating to securities:

> (1) to employ a device, scheme, or artifice to defraud another
> person; or
> (2) to engage in an act, practice, or course of business that operates or would
> operate as a fraud or deceit upon another person

295.     Metals and Barrick, acting through various officers, employees, or agents, and

Batashvili and Asher in connection with the rendering of investment advice, (1) employed a

device, scheme, or artifice to defraud another person; or (2) engaged in an act, practice, or course

of business that operated or would operate as a fraud or deceit upon another person. Therefore,

Defendants violated S.C. Code Ann. § 35-1-502(a).

296.     Therefore, Defendants violated the South Carolina Uniform Securities Act of

2005.

## COUNT XXVI

### Unlawful Solicitation and Sale of Commodities
### Violations of S.C. Code Ann. § 39-73-20

297.     The allegations in the preceding paragraphs are re-alleged and incorporated herein

by reference.

298.     South Carolina Ann. § 39-73-10(13), provides in relevant part:

> (4) "Commodity" means, except as otherwise specified by the administrator
> . . . a metal or mineral, including a precious metal, a gem, or gemstone
> whether characterized as precious, semi-precious, or otherwise . . .

> (9) "Commodity option" means an account, an agreement, or a contract
> giving a party the right but not the obligation to purchase or sell one or
> more commodities or one or more commodity contracts, or all of the
> foregoing, whether characterized as an option, privilege, indemnity, bid,
> offer, put, call, advance guaranty, decline guaranty, or otherwise. . . .

> (13) "Precious metal" means the following in either coin, bullion, or other
> form:
>           (a) silver;

79

(b) gold;
(c) platinum;
(d) palladium;
(e) copper;
(f) other items the administrator may specify by regulation.

299.   South Carolina Code Ann. § 39-73-20, provides in relevant part:

Except as otherwise provided in Section 39-73-30 or Section 39-73-40 no person may sell or purchase or offer to sell or purchase a commodity under commodity contract or under commodity option or offer to enter into or enter into as seller or purchaser a commodity contract or a commodity option.

300.   South Carolina Code Ann. 39-73-70, provides in relevant part:

(A) The act, omission or failure of an official, an agent, or another person acting for an individual, an association, a partnership, a corporation, or a trust within the scope of his employment or office is deemed the act, omission or failure of the individual, association, partnership, corporation, or trust as well as of the official, agent, or other person.

(B) Every person who directly or indirectly controls another person liable under this chapter, every partner, officer, or director of the other person, every person occupying a similar status or performing similar functions, every employee of the other person who materially aids in the violation also is liable jointly and severally with and to the same extent as the other person, unless the person who also is liable by virtue of this section sustains the burden of proof that he did not know and in exercise or reasonable care could not have known of the existence of the facts by reason of which the liability is alleged to exist.

301.   Metals unlawfully solicited the sale of precious metals and sold precious metals to South Carolina investors.

302.   Metals has never been registered with the South Carolina Secretary of State's Office, nor has Metals submitted a notice filing with the South Carolina Secretary of State's Office at any time.

303.     Batashvili and Asher, directly and by and through their sales representatives or other agents, unlawfully solicited the sale of precious metals and sold precious metals to South Carolina investors, because Batashvili and Asher are employed, appointed, and/or authorized by Metals to solicit the sale of precious metals and sell precious metals on behalf of Metals.

304.     As a result of the foregoing conduct, Metals, Batashvili, and Asher violated S.C. Code Ann. § 39-73-20.

305.     Therefore, the Defendants violated the South Carolina State Commodity Code, S.C. Code Ann. § 39-73-10, *et. seq*.

## COUNT XXVII

### Commodities Fraud
### Violations of S.C. Code Ann. § 39-73-60 (1)-(4)

306.     The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

307.     South Carolina Code Ann. § 39-73-60 (1)-(4), provides in relevant part that no person, directly or indirectly, in or in connection with the purchase or sale of, the offer to sell, the offer to purchase, the offer to enter into, or the entry into of, a commodity contract or commodity option, may:

    a.  Cheat or defraud, attempt to cheat or defraud, or employ a device, a scheme, or an artifice to defraud;

    b.  Make a false report, enter a false record, or make an untrue statement of material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

    c.  Engage in a transaction, an act, a practice, or a course of business, including without limitation a form of advertising or solicitation, which operates or would operate as a fraud or deceit on Metals customers or potential customers;

81

or

    d.   misappropriate or convert the funds, security, or property of a person.

308.    Metals, acting through various officers, employees, or other agents, and Batashvili and Asher, in connection with the solicitation to sell and the sale of precious metals: (1) cheated or defrauded, or attempted to cheat or defraud, another person or employed a device, scheme, or artifice to defraud another person; (2) made a false report, entered a false record, or made an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; (3) engaged in a transaction, act, practice, or course of business, including, without limitation, any form of advertising or solicitation, which operated or would operate as a fraud or deceit upon another person; or (4) misappropriated or converted the funds, security, or property of another person, in connection with the solicitation of a purchase or sale of, the offer to sell, the offer to purchase, the offer to enter into, or the entry into of any commodity contract or commodity option.

309.    Therefore, the Defendants violated the South Carolina State Commodity Code, S.C. Code Ann. § 39-73-10, *et. seq.*

82

## XV.  VIOLATIONS OF THE TEXAS SECURITIES ACT

*(Brought by Plaintiff State of Texas)*

### COUNT XXVIII

**Unregistered Investment Adviser and Investment Adviser Representative
Violations of Tex. Rev. Civ. Stat. Ann. art. 581-12**

310.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

311.    The Texas Securities Act makes it unlawful for a person to act or render services as an investment adviser or investment adviser representative in Texas, including rendering investment advice, unless the person is registered under the Texas Securities Act.

312.    The Texas Securities Act defines an investment adviser as "a person who, for compensation, engages in the business of advising another, either directly or through publications or writings, with respect to the value of securities or to the advisability of investing in, purchasing, or selling securities . . . ."

313.    The Texas Securities Act defines "investment adviser representative" as "each person or company who, for compensation, is employed, appointed, or authorized by an investment adviser to solicit clients for the investment adviser or who, on behalf of the investment adviser, provides investment advice, directly or through subagents…to the investment adviser's clients."

314.    The acts, omissions, and failures of Asher and Batashvili and other officials, agents, or persons acting for Metals described in this Complaint, including sales representatives or other agents, have occurred within the scope of their employment or agency with Metals and

are deemed to be the acts, omissions, and failures of Metals.

315.    Metals, acting through various officers, employees, or agents, and Batashvili and Asher, unlawfully acted as an investment adviser because Metals, for compensation, engaged in the business of advising another, directly and/or through publications or writings, with respect to the value of securities or to the advisability of investing in, purchasing, or selling securities.

316.    Batashvili and Asher unlawfully acted as investment adviser representatives because Batashvili and Asher, for compensation, are employed, appointed, and/or authorized by Metals, an investment adviser, to solicit clients for Metals and they are providing investment advice to Metals' clients, on behalf of Metals.

317.    Metals, Batashvili, and Asher did not register with the Commissioner nor did they submit a notice filing with the Commissioner at any time.

318.    These unlawful acts and practices of Metals, Batashvili, and Asher were committed against Texas residents age 65 and older.

319.    As a result of the foregoing unlawful conduct, Metals, Batashvili, and Asher violated Article 581-12 of the Texas Securities Act and unless permanently enjoined are reasonably likely to continue to violate the Texas Securities Act.

<strong><u>COUNT XXIX</u></strong>

<strong>Securities Fraud</strong>

320.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

321.    Article 581-32 of the Texas Securities Act makes it unlawful for a person to engage in or about to engage in fraud or fraudulent practices in connection with the rendering of

84

services as an investment adviser or investment adviser representative.

322.    Article 581-4 of the Texas Securities Act defines "fraud" or "fraudulent practice" to "include any misrepresentations, in any manner, of a relevant fact; any promise or representation or predication as to the future not made honestly and in good faith, or an intentional failure to disclose a material fact; the gaining, directly or indirectly, through the sale of a security, of an underwriting or promotion fee or profit, selling or managing commission or profit, so gross or exorbitant as to be unconscionable; any scheme device or other artifice to obtain such profit, fee, or commission; provided, that nothing herein shall limit or diminish the full meaning of the terms "fraud," "fraudulent," and "fraudulent practice" as applied or accepted in courts of law or equity."

323.    The acts, omissions, and failures of Asher and Batashvili and other officials, agents, or persons acting for Metals described in this Complaint, including sales representatives or other agents, have occurred within the scope of their employment or agency with Metals and are deemed to be the acts, omissions, and failures of Metals.

324.    Metals, acting through various officers, employees, or other agents, and Batashvili and Asher, in connection with the rendering of investment advice, have and continue to intentionally fail to disclose the following material facts:

> a.  Precious Metals Bullion involve considerable risk and market prices are at times volatile and may be affected by economic conditions, political events, and speculative activities; and
>
> b.  Information about complaints, including complaints relating to fraudulent, deceptive, and illegal practices sent, submitted, or otherwise levied by prior investors.

325.    Metals, acting through various officers, employees, or other agents, and Batashvili

and Asher, in connection with the rendering of investment advice, have misrepresented and are continuing to misrepresent relevant facts to potential investors. These misrepresentations include:

    a.   Metals does not charge fees for the purchase of Precious Metals Bullion;

    b.   Potential investors only pay the retail prices of the Precious Metals Bullion; and

    c.   Advising potential investors that investments in Precious Metals Bullion are safe and conservative investments but stating on their website and in their Customer Agreements that investments in Precious Metals Bullion are not safe and conservative investments.

326.    These unlawful acts and practices of Metals, Batashvili, and Asher were committed against Texas residents age 65 and older.

327.    As a result of the foregoing unlawful conduct, Metals, Batashvili, and Asher have engaged in and are engaging in fraud and fraudulent practices in connection with rendering investment advice in violation of Article 581-32 the Texas Securities Act, and unless permanently enjoined are reasonably likely to continue to engage in fraud or fraudulent practices in connection with rendering investment advice in violation of the Texas Securities Act.

## XVI.  DISGORGEMENT OF **FUNDS** FROM RELIEF DEFENDANT TOWER EQUITY

### COUNT XXX

### Disgorgement of Funds from Relief Defendant

*(Brought by all Plaintiffs)*

328.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

329.    During the Relevant Period, Relief Defendant Tower Equity received funds

and/or property as a result of Defendants' fraudulent conduct and has received benefits or otherwise has been unjustly enriched thereby.

330.     Relief Defendant Tower Equity has no legitimate entitlement to or interest in all of the funds and/or property received as a result of the Defendants' fraudulent conduct.

331.     Relief Defendant Tower Equity should be required to disgorge funds and/or property up to the amount it received from Defendants' fraudulent conduct or the value of those funds that it may have subsequently transferred to third parties.

## XVII. RELIEF REQUESTED

332.     The CFTC and the States respectfully request that this Court, as authorized by Section 6c of the CEA, 7 U.S.C. § 13a-1 (2018), Section 6d(1) of the CEA, 7 U.S.C. § 13a-2(1) (2018), 28 U.S.C § 1367(1) (2018), and pursuant to its own equitable powers:

A.     Find that Defendants violated Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1) (2018), and CFTC Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2019);

B.     Find that Defendants violated the laws of the States as set forth above;

C.     Enter an order of permanent injunction enjoining Defendants and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, who receive actual notice of such order by personal service or otherwise, from violating 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3) and the laws of the States.

D.     Enter an order of permanent injunction restraining and enjoining Defendants and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all

persons in active concert with them, from directly or indirectly:

1) Trading on or subject to the rules of any registered entity (as that term is defined by Section 1a(40) of the CEA, 7 U.S.C. § 1a(40) (2018));

2) Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2019)), for accounts held in the name of any Defendant or for accounts in which any Defendant has a direct or indirect interest;

3) Having any commodity interests traded on any Defendant's behalf;

4) Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

5) Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling of any commodity interests;

6) Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC except as provided for in CFTC Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2019);

7) Acting as a principal (as that term is defined in CFTC Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2019)), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the CFTC except as provided for in 17 C.F.R. § 4.14(a)(9) (2019);

88

and

8)      Acting as a broker-dealer or investment adviser or associating with a licensed broker-dealer or investment adviser, in violation of the laws of the States.

E.      Enter an order directing Defendants as well as any third-party transferee and/or successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the CEA or CFTC Regulations or the Laws of the States, as described herein, during the Relevant Period, including pre-judgment and post-judgment interest;

F.      Enter an order directing Relief Defendant Tower Equity, including any third-party transferee and/or successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, funds, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the CEA or CFTC Regulations, or the laws of the States, including pre-judgment and post-judgment interest;

G.      Enter an Order requiring Defendants to make restitution, pursuant to such procedure as the Court may order, to persons who have sustained losses proximately caused by Defendants' violations of the CEA or CFTC Regulations, or the laws of the States, as described herein, including pre-judgment and post-

89

judgment interest;

H.    Enter an order directing Defendants to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between Defendants and any of the investors whose funds were received by Defendants as a result of Defendants' violations of the CEA or CFTC Regulations, or the laws of the States, as described herein;

I.    Enter an order directing Defendants to pay a civil monetary penalty assessed by the Court, in an amount not to exceed the penalty prescribed by Section 6c(d)(1) of the CEA, 7 U.S.C. § 13a-1(d)(1) (2018), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, title VII, § 701, 129 Stat. 584, 599-600, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2019), for each violation of the CEA or CFTC Regulations, and pay civil monetary penalties and/or damages pursuant to the laws of the States during the Relevant Period;

J.    Enter an order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2413(a)(2) (2018) and the laws of the States;

K.    Enter an order appointing a temporary and permanent receiver; and

L.    Enter an order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.

Dated: September 22, 2020    Respectfully submitted,

By: _____

JONMARC BUFFA *pro hac vice pending*
jbuffa@cftc.gov
California Bar # 217324

RICHARD FOELBER *pro hac vice pending*
rfoelber@cftc.gov
Illinois Bar # 0840904

Attorneys for Plaintiff
COMMODITY FUTURES TRADING
COMMISSION
1155 21st Street. NW
Washington. DC 20580
(202) 418-5000

FOR THE STATE OF ALABAMA

By: /s/ Jeffery A. "Beau" Brown, Jr _____

JEFFERY A. "BEAU" BROWN, JR., *pro hac vice
pending*
Beau.Brown@asc.alabama.gov
Alabama Bar No. 7258R80B

ANNE GUNTER, *pro hac vice pending*
anne.gunter@asc.alabama.gov
Alabama Bar No. 4666N91P

Attorneys for Plaintiff
STATE OF ALABAMA
SECURITIES COMMISSION
445 Dexter Avenue, Suite 12000
 Montgomery, AL 36104
Telephone: (334) 322-8586
Fax: (334) 242-0240

FOR THE STATE OF ALASKA

By: /s/ Robert Schmidt

ROBERT SCHMIDT, *pro hac vice pending*
rob.schmidt@alaska.gov
Alaska Bar No. 9909048
JOHN HALEY
john.haley@alaska.gov
Alaska Bar No. 1402010

Attorneys for Plaintiff
STATE OF ALASKA
OFFICE OF ATTORNEY GENERAL
1031 West Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Telephone: (907) 269-6645
Fax: (907) 276-3697


FOR THE STATE OF ARIZONA

By: /s/ Christopher Nichols

CHRISTOPHER NICHOLS, *pro hac vice pending*
cnichols@azcc.gov
Arizona Bar No. 029958

Attorney for Plaintiff
ARIZONA CORPORATION COMMISSION
1300 W. Washington St.
Phoenix, AZ 85007
Telephone: (602) 542-0639
Fax: (602) 714-8120


FOR THE STATE OF CALIFORNIA

By: /s/ Danielle Stoumbos

MARY ANN SMITH
MaryAnn.Smith@dbo.ca.gov

92

SEAN ROONEY
Sean.Rooney@dbo.ca.gov
DANIELLE A. STOUMBOS, *pro hac vice pending*
California Bar No. 264784
Danielle.Stoumbos@dbo.ca.gov

Attorneys for Plaintiff
STATE OF CALIFORNIA
DEPARTMENT OF BUSINESS OVERSIGHT
320 West Fourth Street, Suite 750
Los Angeles, California 90013
Telephone: (213) 503-2046
Fax: (213) 576-7181


FOR THE STATE OF COLORADO
PHILIP J. WEISER
Attorney General of the State of Colorado

By: /s/ Janna Fischer

JANNA FISCHER*, *pro hac vice pending*
janna.fischer@coag.gov
Colorado Bar No. 44952
ROBERT FINKE*, *pro hac vice pending*
robert.finke@coag.gov
Colorado Bar No. 40756
*Counsel of Record

Attorneys for Plaintiff
SECURITIES COMMISIONER
FOR THE STATE OF COLORADO
1300 Broadway, 8th Floor
Denver, Colorado 80203
Telephone: (720) 508-6374
Fax: (720) 508-6037


FOR THE STATE OF DELAWARE
KATHLEEN JENNINGS
Attorney General of the State of Delaware

By: /s/ Katherine M. Devanney

93

KATHERINE M. DEVANNEY, *pro hac vice pending*
Deputy Attorney General
Delaware Bar No. 6356
Texas Bar No. 24116281
katherine.devanney@delaware.gov
JILLIAN LAZAR
Director of Investor Protection
Delaware Bar No. 6049
jillian.lazar@delaware.gov

Delaware Department of Justice
820 N. French St.
Wilmington, DE 19801
Telephone: (302) 577-8356
Fax: (302) 577-6987

Attorneys for Plaintiff the State of Delaware


FOR THE STATE OF FLORIDA
ASHLEY MOODY
Attorney General for the State of Florida


By: /s/ Victoria Butler _____

VICTORIA BUTLER, *pro hac vice pending*
Assistant Attorney General
Director of Consumer Protection
victoria.butler@myfloridalegal.com
Florida Bar No. 861250

Attorney for Plaintiff
STATE OF FLORIDA
OFFICE OF THE ATTORNEY GENERAL
Department of Legal Affairs
3507 E Frontage Rd, Suite 325
Tampa, FL 33607-1795
Telephone: (813) 287-7950
Fax: (813) 281-5515

94

By: /s/ A. Gregory Melchior

A. GREGORY MELCHIOR, *pro hac vice pending*
Assistant General Counsel
greg.melchior@flofr.com
Florida Bar No. 407290

Attorney for Plaintiff
STATE OF FLORIDA
OFFICE OF FINANCIAL REGULATION
1313 Tampa Street, Suite 615
Tampa, Florida 33602-3394
Telephone: (813) 218-5327
Fax: (813) 272-2498

FOR THE STATE OF GEORGIA

By: /s/ Logan B. Winkles

LOGAN B. WINKLES, *pro hac vice pending*
Georgia Bar No. 136906
lwinkles@law.ga.gov
RONALD J. STAY, *pro hac vice pending*
Georgia Bar No. 621732
rstay@law.ga.gov

Attorneys for Plaintiff
OFFICE OF THE GEORGIA
SECRETARY OF STATE
Georgia Department of Law
40 Capitol Square SW
Atlanta, GA 30334
Telephone: (404) 458-3434
Fax: (404) 657-3239

FOR THE STATE OF HAWAII

By: /s/ Rayni M. Nakamura-Watanabe

RAYNI M. NAKAMURA-WATANABE, *pro hac vice pending*
Hawaii Bar No. 9032-0
RNakamur@dcca.hawaii.gov
PATRICIA J. MOY
Hawaii Bar No. 5845-0
PMoy@dcca.hawaii.gov

Attorneys for Plaintiff
STATE OF HAWAII
SECURITIES ENFORCEMENT BRANCH
335 Merchant Street, Suite 205
Honolulu, Hawaii 96813
Telephone: (808) 586-2740
Fax: (808) 586-3977


FOR THE STATE OF IDAHO
OFFICE OF THE ATTORNEY GENERAL
STATE OF IDAHO
LAWRENCE G. WASDEN

By: /s/ Loren Messerly

LOREN MESSERLY, *pro hac vice pending*
Deputy Attorney General
loren.messerly@finance.idaho.gov
Idaho Bar No. 7434

Attorney for Plaintiff
STATE OF IDAHO
IDAHO DEPARTMENT OF FINANCE
P.O. Box 83720
Boise, ID 83720-0031
Telephone: (208) 332-8093
Fax: (208) 332-8099

96

FOR THE STATE OF INDIANA
OFFICE OF THE INDIANA ATTORNEY
GENERAL
Patricia Orloff Erdmann
Chief Counsel of Litigation

By: /s/ Jefferson S. Garn

JEFFERSON S. GARN, *pro hac vice pending*
Deputy Attorney General
Jefferson.Garn@atg.in.gov
Indiana Bar No. 29921-49

Attorney for Plaintiff
STATE OF INDIANA
INDIANA SECURITIES COMMISSIONER
302 W. Washington Street
IGCS – 5th Floor
Indianapolis, IN 46204
Fax: (317) 232-7979

FOR THE STATE OF KANSAS

By: /s/ Thomas E. Knutzen

THOMAS E. KNUTZEN, *pro hac vice pending*
*Special Assistant Attorney General*
tom.knutzen@ks.gov
Kansas Bar No. 24471

Attorney for Plaintiff
OFFICE OF THE KANSAS SECURITIES
COMMISSIONER
1300 SW Arrowhead Road
Topeka, KS 66604
Telephone: (785) 296-7890
Fax: (785) 296-6872

97

FOR THE STATE OF KENTUCKY

By: /s/ Gary Stephens _____

GARY STEPHENS, *pro hac vice pending*
Gary.stephens@ky.gov
Kentucky Bar No. 87740
CATHERINE FALCONER
Catherine.falconer@ky.gov

Attorneys for Plaintiff
STATE OF KENTUCKY
DEPARTMENT OF FINANCIAL INSTITUITONS
500 Mero St. 2SW19
Frankfort, KY 40601
Telephone: (502) 782-9052
Fax: (502) 573-8787


FOR THE STATE OF MAINE

By: /s/ Gregg D. Bernstein _____

GREGG D. BERNSTEIN, *pro hac vice pending*
gregg.bernstein@maine.gov
Maine Bar No. 8424

Attorney for Plaintiff
STATE OF MAINE SECURITIES
ADMINISTRATOR
6 State House Station
Augusta, Maine 04333
Telephone: (207) 626-8800
Fax: (207) 626-8828


FOR THE STATE OF MARYLAND

BRIAN E. FROSH
ATTORNEY GENERAL OF THE STATE OF
MARYLAND

By: /s/ Max F. Brauer _____

98

MAX F. BRAUER, *pro hac vice pending*
Assistant Attorney General
mbrauer@oag.state.md.us
Maryland State Does Not Use Bar Numbers

Attorney for Plaintiff
STATE OF MARYLAND EX REL
MARYLAND SECURITIES COMMISSIONER
200 Saint Paul Place
Baltimore, MD 21202
Telephone: (410) 576-6950
Fax: (410) 576-6532


FOR THE PEOPLE OF MICHIGAN

By: /s/ Aaron W. Levin

PEOPLE OF THE STATE OF
MICHIGAN, by DANA NESSEL
ATTORNEY GENERAL

Aaron W. Levin, *pro hac vice pending*
Assistant Attorney General
levina@michigan.gov
Michigan Bar No. P81310

Attorney for Plaintiff
Michigan Department of Attorney General
525 W. Ottawa Street,
P.O. Box 30736
Lansing, MI 48909
Telephone: (517) 335-7632
Fax: (517) 335-7632


FOR THE STATE OF MISSISSIPPI

By: /s/ Seth Shannon

SETH SHANNON, *pro hac vice pending*
seth.shannon@ago.ms.gov

99

Mississippi Bar No. 103466
CRYSTAL UTLEY SECOY
crystal.utley@ago.ms.gov

Attorneys for Plaintiff
STATE OF MISSISSIPPI
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 220
Jackson, MS 39205
Telephone: (769) 237-6406
Fax: (601) 359-4231


FOR THE STATE OF NEBRASKA
L. JAY BARTEL
Bureau Chief
Legal Services Bureau


By: /s/ Joshua R. Shasserre

JOSHUA R. SHASSERRE, *pro hac vice pending*
Assistant Attorney General
Nebraska Bar No. 23885
joshua.shasserre@nebraska.gov

Attorney for Plaintiff
STATE OF NEBRASKA
2115 State Capitol
Lincoln, NE 68509
Telephone: (402) 471-3888
Fax: (402) 471-3297


FOR THE STATE OF NEVADA

By: /s/ Erin M. Houston

ERIN M. HOUSTON, *pro hac vice pending*
Deputy Secretary of State, Securities Administrator
Nevada Bar No. 11814
ehouston@sos.nv.gov

100

Attorney for Plaintiff
STATE OF NEVADA
Office of the Nevada Secretary of State
Securities Division
2250 North Las Vegas Blvd., Suite 400
North Las Vegas, NV 89030
Telephone: (702) 486-2440
Fax: (702) 486-2452


FOR THE STATE OF NEW MEXICO

By: /s/ Alissa N. Berger _____ _____

ALISSA N. BERGER, *pro hac vice pending*
Securities Enforcement Prosecutor
New Mexico Securities Division
New Mexico Bar No. 21769
Alissa.Berger@state.nm.us

Attorney for Plaintiff
STATE OF NEW MEXICO
New Mexico Securities Division
New Mexico Regulation and Licensing Department
5500 San Antonio Rd NE
Albuquerque, New Mexico 87109
Telephone: (505) 503-5987
Fax: (505) 222-9848


FOR THE STATE OF NEW YORK
LETITIA JAMES
ATTORNEY GENERAL OF THE STATE OF
NEW YORK

By: /s/ Tatyana Trakht _____

TATYANA "TANYA" TRAKHT, *pro hac vice pending*
Assistant Attorney General
tanya.trakht@ag.ny.gov
New York State Does Not Use Bar Numbers
PETER POPE

101

Chief, Investor Protection Bureau
peter.pope@ag.ny.gov

Attorneys for Plaintiff
ATTORNEY GENERAL FOR THE STATE OF
NEW YORK
28 Liberty Street, 21st Floor
New York, New York 10005
Telephone: (212) 416-8457
Fax: (212) 416-8816

FOR THE STATE OF OKLAHOMA

By: /s/ Robert Fagnant

ROBERT FAGNANT, *pro hac vice pending*
rfagnant@securities.ok.gov
Oklahoma Bar No. 30548

Attorney for Plaintiff
OKLAHOMA DEPARTMENT OF SECURITIES
204 N. Robinson Avenue, Suite 400
Oklahoma City, OK 73102
Telephone: (405) 280-7718
Fax: (405) 280-7742

FOR THE STATE OF SOUTH CAROLINA

By: /s/ Jonathan Williams

JONATHAN WILLIAMS, *pro hac vice pending*
jwilliams@scag.gov
South Carolina Bar No. 72509

Attorney for Plaintiff
STATE OF SOUTH CAROLINA
OFFICE OF ATTORNEY GENERAL
P.O. Box 11549
Columbia, SC 29211
Telephone: (803) 734-7208
Fax: (803) 734-7208

102

By: /s/ Shannon A. Wiley

SHANNON A. WILEY, *pro hac vice pending*
swiley@sos.sc.gov
South Carolina Bar No. 69806

Attorney for Plaintiff
STATE OF SOUTH CAROLINA
OFFICE OF THE SECRETARY OF STATE
1205 Pendleton Street, Suite 525
Columbia, SC 29201
Telephone: (803) 734-0246
Fax: (803) 734-1661


FOR THE STATE OF SOUTH DAKOTA

By: /s/ Clayton Grueb

CLAYTON GRUEB, *pro hac vice pending*
South Dakota Bar No. 4642
Clayton.grueb@state.sd.us

Attorney for Plaintiff
South Dakota Department of Labor & Regulation,
Division of Insurance
2330 N. Maple Ave, Suite 1
Rapid City, SD 57701
Telephone: (605) 773-3563
Fax: (605) 773-5369


FOR THE STATE OF TENNESSEE
HERBERT H. SLATERY III
Attorney General and Reporter
for the State of Tennessee

By: /s/ James P. Urban

JAMES P. URBAN, *pro hac vice pending*
Deputy Attorney General

103

TN B.P.R. No. 033599
james.urban@ag.tn.gov

Office of Tennessee Attorney General
Financial Division
P.O. Box 20207
Nashville, TN 37202-0207
Telephone: (615) 741-3739
Fax: (615) 532-8223

Attorney for Plaintiff
Commissioner of the Tennessee Department of
Commerce and Insurance


FOR THE STATE OF TEXAS
KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

RYAN L. BANGERT
Deputy First Assistant Attorney General

DARREN L. MCCARTY
Deputy Attorney General for Civil Litigation

JOSHUA R. GODBEY
Division Chief
Financial Litigation and Charitable Trusts Division

By: */s/ Christina Cella* _____

CHRISTINA CELLA
Assistant Attorney General
State Bar No. 24106199
christina.cella@oag.texas.gov
LEA N. BRIGTSEN
Assistant Attorney General
State Bar No. 24054504
lea.brigtsen@oag.texas.gov

104

Financial Litigation and Charitable Trusts Division
P.O. Box 12548
Austin, Texas 78711-2548
Telephone: (512) 475-2952
Fax: (512) 477-2348
*Attorneys for Plaintiff the State of Texas*


FOR THE STATE OF WASHINGTON

By: /s/ Ian S. McDonald

IAN S. MCDONALD, *pro hac vice pending*
Washington Bar No. 41403
Ian.McDonald@atg.wa.gov
Telephone: (360) 586-3264
Fax: (360) 664-0229

Attorney for Plaintiff
Washington State Department of Financial
Institutions, Securities Division
150 Israel Rd. SW
Tumwater, WA 98501
Telephone: (360) 902-8700
Fax: (360) 902-0524


FOR THE STATE OF WEST VIRGINIA

By: /s/ Michael Nusbaum

MICHAEL NUSBAUM, *pro hac vice pending*
michael.nusbaum@wvsao.gov
West Virginia Bar No. 12708

Attorney for Plaintiff
STATE OF WEST VIRGINIA
WEST VIRGINIA SECURITIES COMMISSION
1900 Kanawha Boulevard, East
Building 1, Room W-100
Charleston, WV 25305

105

Telephone: (304) 558-2251
Fax: (304) 558-4211


FOR THE STATE OF WISCONSIN
JOSHUA L. KAUL
Attorney General
State of Wisconsin
Wisconsin Department of Justice

By: /s/ Shannon A. Conlin

SHANNON A. CONLIN, *pro hac vice pending*
Assistant Attorney General
Wisconsin Bar No. 1089101
Conlinsa@doj.state.wi.us

WISCONSIN DEPARTMENT OF JUSTICE
Post Office Box 7857
Madison, WI 53707-7857
Telephone: (608) 266-1677
Fax: (608) 267-2779

*Attorney for Plaintiff State of Wisconsin*


FOR THE IOWA INSURANCE
COMMISSIONER
DOUGLAS M. OMMEN

By: */s/ Adam J. Kenworthy*
ADAM KENWORTHY* *pro hac vice pending*
Iowa Bar No. AT0012137
Enforcement Attorney
adam.kenworthy@iid.iowa.gov

Attorney for Plaintiff
IOWA INSURANCE DIVISION
1963 Bell Ave, Ste 100
Des Moines, IA 50315
Telephone: (515) 654-6562
Fax: (515)-654-6500

106